AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| | ) | Case No. 3:22-mj-0001 DMC |
| | ) | |
| | ) | |
| | ) | |
| Sherri Papini | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   August 7, 2017 and August 13, 2020   in the county of_____ Shasta _____in the

_____ Eastern _____ District of_____ California _____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1001(a)(2) | False Statements |
| 18 U.S.C. § 1341 | Mail Fraud |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached  sheet.

_____
*Complainant's signature*

FBI Special Agent Courtney Lantto
*Printed name and title*

Sworn to before me and signed telephonically.

Date:   March 2, 2022

_____
*Judge's signature*

City and state:   Redding, California

Dennis M. Cota, U.S. Magistrate Judge
*Printed name and title*

PHILLIP A. TALBERT
United States Attorney
VERONICA M.A. ALEGRÍA
SHELLEY D. WEGER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone:  (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:22-mj-0001 DMC |
| Plaintiff, | |
| v. | AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT |
| SHERRI PAPINI, | **UNDER SEAL** |
| Defendant. | |

I, Courtney E. Lantto, being first duly sworn, hereby depose and state as follows:

## I.    **INTRODUCTION AND AGENT BACKGROUND**

1.      This affidavit is made in support of a criminal complaint and arrest warrant for Sherri Papini ("PAPINI") for making false statements to a federal law enforcement officer in violation of Title 18, United States Code, Section 1001(a)(2) and engaging in mail fraud in violation of Title 18 United States Code, Section 1341.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since August 2010. Currently, I am assigned to the Sacramento Division, and I work out of the Redding Resident Agency. My training has included attending the FBI Academy's Basic Agent Training, wherein I received instruction on various aspects of federal investigations. As part of my official duties, I investigate cases involving kidnapping, false statements, and fraud.

3.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and part only.

## II.     SUMMARY OF PROBABLE CAUSE

4.     In November 2016, PAPINI went missing for several weeks and law enforcement conducted a nation-wide search for her.  When she returned, she told federal law enforcement officers and others that she had been abducted by two Hispanic women.  PAPINI also provided details of the alleged Hispanic women to an FBI sketch artist and sent text messages to FBI agents about instruments the Hispanic women used to inflict injuries on PAPINI. However, this was a false narrative PAPINI fabricated; in truth, PAPINI was staying with a former boyfriend ("Ex-Boyfriend") and harmed herself to support her false statements.

5.     Ex-Boyfriend told investigators that PAPINI stayed with him at his house during the dates of her disappearance, and that it was PAPINI who reached out to him and asked him to come pick her up in Redding. DNA evidence recovered from PAPINI's clothing she was wearing when she returned matched Ex-Boyfriend's DNA. Phone records show that PAPINI and Ex-Boyfriend were talking to one another as early as December 2015. Ex-Boyfriend told investigators that he and PAPINI used prepaid phones to talk to one another; this was corroborated through evidence of two prepaid cellular phones that were tied to the Ex-Boyfriend and would communicate with each other – one from PAPINI's location and the other from Ex-Boyfriend's location. Historical cell site analysis and toll records of the prepaid phones indicated that Ex-Boyfriend traveled to Redding on or about the date of PAPINI's disappearance, PAPINI and Ex-Boyfriend exchanged text messages the morning PAPINI disappeared, they met together around the location where PAPINI was last seen, and PAPINI and Ex-Boyfriend traveled to Southern California together. Ex-Boyfriend's cousin ("Cousin") told investigators that Cousin saw PAPINI in Ex-Boyfriend's apartment on two different occasions, both times unrestrained. Ex-Boyfriend also told investigators that, approximately three weeks later, he had

a friend rent a car for him and then Ex-Boyfriend drove PAPINI back to Northern California, which was corroborated by car rental records and the odometer reading on the rental car.

6. When PAPINI was interviewed by a federal agent in August 2020, she was warned that it was a crime to lie to federal agents and confronted with evidence that she was not abducted but instead arranged to have Ex-Boyfriend pick her up and take her to his home. PAPINI did not retract her kidnapping story, and instead continued to make false statements about her purported abductors and denied her Ex-Boyfriend's involvement. In addition, PAPINI caused the California Victim's Compensation Board ("CalVCB") to pay over $30,000 in fraudulent victim assistance money based on her false kidnapping story, including reimbursements for therapy sessions, blinds, and ambulance services. At least one of these reimbursements was via the U.S. mail.

### III. STATEMENT OF PROBABLE CAUSE

#### A. Nationwide Search Conducted When PAPINI Went Missing

7. At approximately 5:50 p.m. on November 2, 2016, PAPINI's then husband ("Husband") reported his wife PAPINI missing from their home. PAPINI was the 34-year-old mother of their two young children who lived in the Mountain Gate area of Shasta County, near Redding, California, in the Eastern District of California. Husband told Shasta County Sheriff's Office ("SCSO") deputies that when he arrived home from work, he was unable to locate PAPINI or their two children. Husband learned that the children had not been picked up from daycare, as was customary. Husband checked his "find my iPhone" app and was able to locate PAPINI's phone near Sunrise Drive in Redding, California. He went to the location and retrieved the phone. PAPINI was last seen running on Sunrise Drive and was believed to have gone missing between the hours of 10:00 a.m. and 12:00 p.m. The SCSO requested FBI assistance in the investigation into PAPINI's disappearance.

8. Extensive searches were conducted for PAPINI all over Shasta County as well as in several states as the investigation gained worldwide attention. Hundreds of tips were submitted to the SCSO and to the FBI. Numerous items of potential evidence were collected from various searches, with none of them leading to PAPINI's whereabouts.

9. Immediately upon PAPINI's disappearance, law enforcement scoured the area where PAPINI appeared to have gone missing. Husband showed SCSO detectives where he found PAPINI's

1  cellphone and earbuds with blond hairs entangled in them at the south corner of Sunrise Drive and Old

2  Oregon Trail, about two feet off the road. Husband thought the cellphone had been placed, which he

3  described as weird. SCSO detectives also did a walkthrough of the Papini residence and found nothing

4  out of the ordinary.  PAPINI's purse and jewelry were accounted for, but Husband did not know if any

5  unusual banking activity was occurring in PAPINI's bank accounts.  In follow up interviews, Husband

6  stated he and PAPINI did not have marital issues but occasionally fought as any married couple would.

7  The last fight they had was in October 2016 over a messy room. Husband stated PAPINI could get

8  loud when she was angry and knew how to push Husband's buttons.

9        10.    An analysis of PAPINI's cellphone found two phone numbers stored under women's

10  names that actually belonged to men: Man 1 and Man 2.  In a text conversation between Man 1 and

11  PAPINI on November 1, 2016, the two discussed meeting in Redding.  Additionally, travel records

12  showed Man 1 traveled to San Francisco on October 28, 2016, and flew back to Michigan on

13  November 2, 2016, the day of PAPINI's disappearance.  Investigators traveled out of state to interview

14  Man 1 and look for PAPINI. PAPINI was not located and Man 1 told investigators that PAPINI and

15  Man 1 met in approximately 2011 when PAPINI was out of town for work. The two spent the

16  weekend together and continued to exchange flirtatious text messages throughout the years.  Although

17  they had planned to meet during Man 1's trip to California, he returned home without seeing her.

18        11.    Investigators also interviewed Man 2, who described meeting PAPINI around 2000-

19  2001 at a Friday Night Live youth program and dating her for several years. Man 2 described PAPINI

20  as an attention-hungry person who told stories to try to get people's attention. Man 2 stated that

21  PAPINI fabricated stories of being the victim of abuse from her family, father, and then Man 2 after

22  the couple broke up.

23        12.    On November 16, 2016, investigators telephonically contacted Person 1, the director of

24  the Friday Night Live youth program, who knew PAPINI from the program. Person 1 stated that

25  PAPINI was the only student Person 1 feared having in the program because PAPINI "was good at

26  creating different realities for people so that they would see what she wanted them to see, which got

27  her really good attention."

28

13.     Investigators learned that PAPINI had a previous marriage to Man 3. Husband told investigators that PAPINI married Man 3, who was in the military, to get medical insurance because of a heart murmur issue.  PAPINI's mother told investigators PAPINI traveled all over the world with her first husband. Investigators located Man 3 and interviewed him on November 14, 2016. Man 3 confirmed that he and PAPINI were married in 2006, prior to his deployment overseas, and stated it was because PAPINI needed health insurance due to complications related to regular egg donations. Man 3 stated that he and PAPINI never lived together and did not travel together, except for once when PAPINI visited Man 3 in Japan. When Man 3 returned from deployment, PAPINI told him she had found someone else and wanted a divorce, to which Man 3 agreed. PAPINI told Man 3 that her family abused her while growing up. After the divorce, Man 3 heard from mutual friends that PAPINI had a history of lying.

14.     Investigators also interviewed several of PAPINI's friends. These friends described PAPINI as being crazy and wild as a youth.  The friends recounted that PAPINI used to run away and one described an incident in which PAPINI ran away from home at age 16 to Southern California and stayed with friends. Multiple friends also stated that PAPINI would make up lies, particularly about being the victim of abuse, especially as a youth.

**B.     PAPINI Discovered on Thanksgiving Morning, 2016**

15.     On November 24, 2016, at approximately 4:30 a.m., the California Highway Patrol ("CHP") responded to several 911 calls made regarding a woman, subsequently identified as PAPINI, standing or running in the middle of Interstate 5 ("I-5"). These included a truck driver, who had stopped for PAPINI and then called 911 to report the incident. A CHP officer found PAPINI with the truck driver along I-5 near Woodland, California, in Yolo County, approximately 146 miles south of the location of her disappearance. PAPINI had a chain around her waist that one arm was bound to, with additional bindings around her other wrist and each ankle. PAPINI was transported to Woodland Hospital where she underwent several physical examinations. She appeared to have lost a considerable amount of weight, and her long blonde hair had been cut much shorter. She had been branded on her right shoulder, although the exact content of the brand was indistinguishable. PAPINI's nose was swollen, she had bruises on her face, rashes on her left arm and left upper inner thigh as well as other

1  parts of her body, ligature marks on her wrists and ankles, burns on her left forearm, and bruising on

2  her pelvis and the fronts of both legs. Toxicology results did not show any significant trace of

3  narcotics in PAPINI's system at the time of her return and a physical exam did not show evidence of

4  sexual assault.

5      16.    While at Woodland Hospital, PAPINI's clothing was collected for DNA sampling,

6  including her sweatshirt, sweatpants, socks, and underwear. PAPINI told investigators that this was

7  her original underwear from the day of her disappearance. The clothing was submitted to the

8  California Department of Justice ("CA DOJ"), Bureau of Forensic Services ("BFS"), Redding

9  Laboratory for processing. Mixtures of DNA consistent with PAPINI and one male contributor who

10  was not Husband were recovered from multiple cuttings taken from PAPINI's underwear and one

11  cutting taken from PAPINI's sweatpants.[1] The male contributor DNA to PAPINI's clothing was

12  uploaded to the Combined DNA Index System ("CODIS"), where they were routinely searched against

13  profiles from case evidence as well as individuals in the database. In 2020, a familial match to the

14  male contributor DNA was identified, which eventually led to the Ex-Boyfriend, as described in

15  greater detail below.

16      C.    **PAPINI's Allegations of Abduction by Two Hispanic Women at Gunpoint**

17      17.    On November 24, 2016, the day PAPINI was located, SCSO detectives attempted to

18  interview PAPINI at Woodland Hospital and during an ambulance ride from Woodland Hospital to

19  another facility. PAPINI refused to speak to the SCSO detectives, so they gave the audio recorder to

20  Husband, who asked PAPINI questions. The SCSO detectives remained in the room and rode along in

21  the ambulance; however, it was Husband who conducted the interview. The interview was recorded

22  and transcribed in its entirety.  PAPINI provided the following information in the interview:

23          a)    PAPINI stated that her abductors alluded to law enforcement being involved in

24      her kidnapping, and therefore she did not want to speak to law enforcement. PAPINI explained

25      that her abductors read articles to her that stated PAPINI had left voluntarily as opposed to

26      being kidnapped, which PAPINI denied. Further along in the interview, PAPINI again said

27  ────────────────
   [1] A different analysis also identified some sperm or partial sperm in the clothing. However, the

28  male contributor DNA material analyzed may have come from sperm or another source.

that her abductors told her that law enforcement was involved in her kidnapping.  PAPINI

stated, "She was laughing at me. No one believes you. Everyone thinks you ran away. No one

believes you. Guess what? The buyer's a cop, they're never gonna find you." Later in the

same interview, PAPINI expressed concern because officers were writing everything down that

she was saying, and she repeatedly stated that she did not want to talk to law enforcement.

b)        PAPINI said two Hispanic women abducted her, although one of the women

brought her back. "There was an older one and a younger one. They were Hispanic, they

spoke Spanish a lot." The Hispanic women always wore masks and short, black leather gloves.

PAPINI described the older woman as really mean and the younger one as seeming reluctantly

involved. PAPINI described the younger abductor as smaller with curly, long, brown hair who

spoke more Spanish. PAPINI described the older woman as taller and fat, had straight, dark or

black hair with gray in it, and a raspy voice.  The older abductor hit the younger abductor;

although PAPINI never saw this happen, she could hear it.  PAPINI stated that her abductors

always wore masks, sometimes different colored bandanas and sometimes lace masks.  PAPINI

had a hard time remembering many details about her abductors, including a description of the

clothing they were wearing or the words on a hat one of them was wearing.[2]

c)        PAPINI described the events that occurred at the time she was abducted:  A

dark-colored SUV containing the two Hispanic women first drove past her, then backed up

when they saw her jogging up the road. One of the women had on sunglasses, and PAPINI

believed she said, "Can you help me?" PAPINI walked towards the woman, who opened the

door of the vehicle to show PAPINI she had a gun, which PAPINI described as a little revolver.

The woman told PAPINI to put her phone down. PAPINI recalled the woman said something

to the effect of "We don't want to kill you." PAPINI put her phone down and got into the

SUV. PAPINI described the SUV as having tinted windows and either no seats or one seat on

the far side and a hump that went up.[3]

---

[2] For several months, and even years, Redding and the nearby community were on the lookout
for two Hispanic women. Multiple tips were given to law enforcement by the community about
suspicious-looking Hispanic women.

[3] Investigators, including the FBI and SCSO, searched for vehicles that matched PAPINI's

d)      PAPINI said that she did not see where the women took her because they wrapped something over her face. Husband asked PAPINI if her kidnappers put a bag over her head right away. PAPINI responded, "I don't remember. I don't know. I think she may have tazed me. . . . The next thing I remember is all my clothes were gone." Although PAPINI tried to stay awake during the drive, she kept falling asleep. Husband tried to get PAPINI to describe the road trip after she was abducted. He asked her how long the trip took, whether she felt changes in altitude, what she could describe about the vehicle that she was in. PAPINI responded, "I don't remember a lot. . . . I'm missing time. . . . The car smelled really bad . . . Like sewage . . . She stuck me with something. I kept falling asleep."

e)      PAPINI said that the older abductor liked to hit her and the younger one would yell at her in Spanish. PAPINI described how she tried to manipulate her abductors to give her more information about why she was abducted, including offering to clean and cook for them. However, any time the younger abductor spoke to PAPINI, the older woman hit her.

f)      PAPINI said the women put her in a closet with a bucket with kitty litter in it for her to use as a toilet. She described the closet as containing shelves and a metal pole to which the women hooked a cable and a chain to, with the other end of the chain hooked around her waist. There was enough length on it for PAPINI to reach the bed, but she could not reach the door. The chain was unmovable because it was bolted into the ceiling. PAPINI described how, when she did not listen to the women, they would lock her in the closet. PAPINI stated that there were boards on the windows of the room she was kept in.

g)      PAPINI provided additional descriptions of her captivity location and her abductors: "They would play music loudly. That really annoying Mexican music. And they would watch TV . . . There was a fireplace, I could smell it. I could hear that sound, you know when you move the handle to open the fireplace. It made like a creaky sound . . . and it was cold. It was always cold. And it seemed like it rained almost every night." Husband asked

_____

description. Any vehicles that were presented to PAPINI as examples of the possible SUV used in her abduction never quite matched what she recalled as having been the SUV driven by the two Hispanic women.

PAPINI if she ever heard anything distinct that might lead investigators to her abductors, and she answered, "I heard birds. I never heard anything else....... they put the stereo right outside my door and . . . played it super loud." PAPINI described how her location was always cold, and that her abductors would take her blankets away if she made noise."[4] PAPINI told Husband that there was no sexual abuse while she was in captivity.

h)      PAPINI said her abductors fed her once a day, maybe rice or tortillas, and sometimes apples. However, if PAPINI behaved, her abductors gave her additional food. PAPINI stated that many times her abductors gave her Cream of Wheat to eat and described how everything "tasted horrible" and was "crap" or "leftover crap." PAPINI was also given a bottle of water. To give her meals, her abductors "opened the door, put it in there and slammed the door."[5]

i)      When PAPINI disappeared, she was wearing jogging clothes; when she returned, she was wearing grey sweatpants, a grey sweatshirt and her original underwear. During the interview, PAPINI could not explain what happened to her original clothes. PAPINI said she fell asleep during the car ride after she was abducted and woke up in a room with different clothes on with no recollection of how her clothes came to be changed. PAPINI stated, "I didn't have any clothes. All I had left was my underwear, which she let me wash when I took a shower." PAPINI also stated that her abductors cut her hair and put an adult diaper on her.[6]

j)      PAPINI also stated that she was branded after the first time she tried to escape: "I tried to get out the first time and that's when she branded me." PAPINI described how her abductors brought a table in, hit her back, and tied her to the table. When they branded PAPINI, her skin made "a sizzling popping sound" and it was very painful. Later in this same interview, PAPINI said her abductors told her that her buyer wanted PAPINI branded because

---

[4] Based on the descriptors PAPINI provided, investigators believed she had been held in a mountainous location, and focused efforts in areas of higher altitudes.

[5] PAPINI had lost a significant amount of weight by the time she returned.

[6] In all of her subsequent interviews, PAPINI never again mentioned being put in an adult diaper.

that was what he liked. PAPINI never heard her buyer's name because the abductors spoke mostly Spanish and PAPINI did not understand more than a few Spanish words.  These included discussions about medicine, traffic cameras, a delivery date, and a "gamble," as well as Spanish insults directed at PAPINI. When PAPINI would take a shower, she was guarded by the younger abductor holding a gun. The abductor said that they were not supposed to hurt PAPINI, and also mentioned getting paid.[7]

k)      PAPINI could not remember much of the day she was returned. She heard the two women arguing in Spanish. PAPINI believed the younger abductor was saying that PAPINI needed medicine. PAPINI heard what she believed was a gun shot, and then said she could hear the younger one leave. PAPINI said the younger abductor was gone for a long time, and PAPINI was left alone in the house. PAPINI stated that she screamed and screamed until she fell asleep.  PAPINI explained, "I listened so carefully, but it was all Spanish ....... I heard [the word] gambling." PAPINI was asleep when the younger abductor came to get her to leave. It "happened really fast" and then PAPINI was in the car. PAPINI believed a pillowcase was put over her head at some point but did not recall when or how.

l)      PAPINI said that she tried hard to stay awake during the drive, but it was hard for her to stay awake, and she kept falling asleep. PAPINI's abductor stopped the car and told PAPINI to "get out." PAPINI explained that when the younger abductor dropped her off, she "clipped something" off PAPINI's arm that allowed PAPINI to move her arm. Then the abductor sped off. PAPINI's abductor was already far away by the time PAPINI was able to pull the pillowcase off her head. PAPINI stated that she ran to a church and banged on the door, but nobody was there. PAPINI then ran to the freeway, where she tried to flag down motorists. Eventually a truck driver stopped for PAPINI and assisted her until CHP arrived.

18.     On November 28 and 29, 2016, SCSO detectives interviewed PAPINI at her residence and the residence of a family member. These interviews were recorded and transcribed in their

_____

[7] Investigators initially believed PAPINI's abduction was related to human trafficking based on the statements she made regarding a buyer and her abductors discussing getting paid for having abducted PAPINI.

1  entirety. During these interviews, PAPINI described more details about her abduction.  PAPINI

2  refused to be alone with the detectives and insisted Husband be present.

3          a)      Detectives explained to PAPINI that even though their questions to PAPINI

4  might seem trivial or dumb, there was a reason the detectives were asking those questions.

5  PAPINI explained that she understood because she watched a lot of crime shows on television.

6  SCSO detectives asked PAPINI to start from the beginning and describe the events that led up

7  to her abduction.

8          b)      PAPINI described the morning of her abduction as following her usual routine;

9  she took her kids to daycare, cleaned up around the house and had begun to wrap a Christmas

10  present for Husband. At approximately 11:00 a.m., PAPINI sent a text message to Husband,

11  asking him to come home for lunch. PAPINI joked with the detectives that Husband was

12  embarrassed about the last text message PAPINI sent him before she disappeared, which she

13  stated was along the lines of: "Honey, would you please come home, to have sex with your

14  wife, for lunch?"

15          c)      Since Husband would not be able to come home for lunch, PAPINI decided to

16  go for a run. She explained that she recently had a breast augmentation procedure and had just

17  begun to heal enough to start jogging. PAPINI wanted to train for a local 5K race and had been

18  using a cell phone app to help her train. PAPINI said she almost always listened to her

19  wedding song – Michael Buble's "Everything" – when she ran because "it's a good pace

20  keeper."[8]

21          d)      PAPINI described the route she took and the people she saw along the route.  As

22  she approached the end of Sunrise Drive, she saw a dark colored SUV with a long back

23  window drive past her, and then back up after the occupants of the vehicle saw her. When the

24  vehicle backed up, the woman in the passenger seat called out to PAPINI and asked for help.

25  PAPINI explained that she had her phone in her right hand and her earbuds on and she took out

26  her left earbud to hear the woman. When PAPINI approached the vehicle, the woman opened

27  _____
   [8] When Husband found PAPINI's phone, it was playing Michael Buble's song "Everything" on

28  repeat.

the door and PAPINI saw she had a "small revolver" in her hand. PAPINI "immediately ducked down," set her phone and earbuds on the ground, and pulled out some of her hair to leave with her phone and earbuds. PAPINI said she believed the woman said something like, "We don't want to hurt you" or "we don't want to kill you."

e)      PAPINI could not remember getting into the car. She remembered she had a pillowcase over her head but had no recollection of how the pillowcase came to be over her head. She stated that she woke up already in the vehicle with the pillowcase over her head, and it smelled of laundry detergent. PAPINI stated that she felt nauseous and cold during the drive. She was lying in the back of the vehicle on the floor, the road was windy, her wrists hurt, and her hips were achy from the way she was positioned. When a detective asked how long it took for PAPINI to get achy hips when she laid on her side, PAPINI estimated approximately forty minutes based on the television show she last watched, which was a crime television show called "Black List." When asked further questions by detectives regarding the trip, PAPINI could not describe the direction that the vehicle went after she got into it and did not recall any stops during the trip. PAPINI could not determine the length of the trip because she kept falling asleep. Her two abductors were women; she could hear them speaking, but they spoke in Spanish, which PAPINI could not understand. When a detective asked if she recalled any music during the trip, PAPINI answered, "Yes.  Mariachi music."  PAPINI could not remember if she heard any commercials to suggest it was a radio playing the music or if it was some type of streaming music from an app.

f)      PAPINI did not remember getting out of the vehicle; the first thing she remembered was waking up in a room. She had zip ties around her wrists, and was no longer in the clothes she had been jogging in. She was wearing sweatpants, a sweatshirt, and no socks. Detectives asked PAPINI if these sweats were the same sweats she had on when she was recovered. PAPINI stated, "No…Um because they would change me…" Detectives asked PAPINI how many times she thought she was changed, and PAPINI stated, "Yeah I…think maybe one more time…The sweatshirt…the top, the top was changed more…"

g)      When she first woke up in the room, PAPINI tried to break the zip ties off her wrists. PAPINI initially stated that her wrists were bound with zip ties behind her back and couldn't break them. When she couldn't break the zip ties, she chewed them until she could break them, and cut her lip in the process. Detectives asked PAPINI if her wrists were bound with one zip tie or two. PAPINI responded, "One." PAPINI explained that she unsuccessfully tried to do "one of these moves" to chop her hands down to break the ties, but she eventually got them off by biting through them, which cut her lip.[9]

h)      PAPINI said that any time she made noise, her captors would come running into her room. Detectives asked PAPINI if there was ever a time that she made a noise and her abductors would not come running in.  PAPINI responded, "No........It was pretty much almost every time." PAPINI stated later in the interview that her abductors often played loud music outside of her room. When detectives asked PAPINI if she ever felt as though she was the only person in the house, she responded, "No" and explained that she could feel movement in the house and the radio was often blaring loud music. PAPINI said that when the music wasn't playing, her abductors would hear her moving in her room and come rushing into the room to beat her. Detectives stated that PAPINI mentioned in a previous interview that she heard the television, and asked if she picked up on any commercials or anything that could help them identify the location of where PAPINI was held. PAPINI said no, because she kept falling asleep and the television was in Spanish.  PAPINI said, "The sound of the radio was scary to me but the TV was…I feel like I would just kind of…rest more."  PAPINI never heard English on the radio or on the television. She later stated that the television wasn't on often, and if there had been English, she just might not have heard it because the television volume was low.

i)      Detectives asked PAPINI about the sounds she heard while she was in captivity. PAPINI said that she listened for neighbors and cars, but she heard nothing. She then stated that she heard the birds. The detectives asked PAPINI what kind of birds she heard, and she

---

[9] PAPINI did not clarify how she was able to get her zip-tied wrists from behind her back to the front of her body to be able to chew them off.

stated, "I know I heard a flicker, because I know what the flicker sounds like." PAPINI told detectives she heard the flicker from the window of the room in which she was held.

      **j)**    After PAPINI was able to get the zip ties off her wrists, she tried to open the door of the room, but it was locked with a deadbolt. She stood on the bed to get to the window, which was covered with two boards. PAPINI stated that she "yanked the fucker out of the wall super quick," referring to a board over the window, and broke her nail in the process. The noise she made while trying to get the boards off the window caused her two abductors to rush into PAPINI's room. They struck PAPINI with something, although PAPINI did not see the object her abductors used to hit her and thought it could have also been a Taser. The next thing PAPINI recalled was waking up in a lot of pain on her back, side, back of the head, and her neck was sore. She stated, "That's all I remember from that experience." [10]

      **k)**    In her previous interview in the hospital and during the ambulance ride, PAPINI stated that she was branded as punishment for her first escape attempt, when she pulled the board off the window. In those same interviews, PAPINI also stated that her abductors told her that her "buyer" wanted her branded. Detectives tried to get clarification from PAPINI and said it was their understanding that it was after this first escape attempt that PAPINI was branded. PAPINI explained that, no, the burn occurred during a later punishment. She stated that her abductors would hurt her when PAPINI "would look up at her" and "any time [PAPINI] wasn't on all fours with [her] head down." Detectives asked PAPINI how she came to understand that she had to drop down to the floor whenever her abductors came into the room, and PAPINI explained that her abductors often told her, "Don't look at me!" although they never said to "get on all fours." Detectives continued to ask PAPINI to explain when and how she was branded and why she had said it was punishment for her first escape. PAPINI explained that the branding was not punishment trying to escape through the window but for making too much noise.

---

[10] PAPINI asked the detectives if her memory could have been disrupted by being tazed, and detectives explained that it could not. PAPINI did not mention being tazed during her abduction in her subsequent interviews.

l)      PAPINI said the branding was done all in one extended time period, and that it was the older abductor who did the actual branding. The younger abductor was to the right and behind PAPINI, and PAPINI believed it was the younger abductor who held the tools they used to brand her with. PAPINI could not see the tools her abductors used because they were behind her, but she described a clicking sound similar to the "tinking of a metal pan…[like] if you were watching a show where they were removing a bullet from someone, and dropping it into a pan?" PAPINI had a hard time remembering the details because she was in so much pain, both from the branding and also because of the weight of her body on her breast implants. Detectives asked PAPINI if she was held down while she was branded. PAPINI responded, "I wasn't necessarily held down. It was…my arm, like I couldn't…pull up." PAPINI did not know what her abductors used for a heat source. PAPINI offered up the possibility that it could have been a craft tool of some sort that was used to brand her, but she never saw it.  PAPINI postulated that the tool was smaller than a fire poker, more like the size of a screwdriver, as her abductor was close to her.

m)      PAPINI explained that after she tried to escape by ripping the board off the window, her abductors put a chain around her waist and tethered her to a cable attached to a pole in the closet. She could reach the bed but not the door or the window. PAPINI tried to get the chain that was around her waist down over her hips, but her abductors caught her trying to do this and tightened the chain. It was the cable that was attached to a pole in the closet that made noise when she moved. PAPINI stated, "Fucking pole is the only reason I was there." PAPINI tried to rip the pole out of the closet, which caused her hands to bleed and her fingernails to break when she tried to get the screws out. PAPINI could not remember if the pole was in the closet before her escape attempt.

n)      Detectives asked PAPINI what she ate while she was in captivity.  PAPINI's answers included the following: Cream of Wheat, but dry and "barely mixed," once she was given two apples, a "weird" cracker, scraps, like "the fat off of . . . a piece of meat or something," a piece of bread, and mostly tortillas and "homemade" "gritty" Spanish rice.

1    o)      PAPINI described how she tried to exercise everyday so she could keep a

2 routine while she was in captivity. However, she had difficulty keeping track of the days

3 because she did not sleep at regular times and generally slept a lot. Detectives asked PAPINI

4 how she could exercise without making noise that would alert her captors. PAPINI stated that

5 she would pull the cable tight and tuck it between her legs.

6    p)      PAPINI told detectives that her abductors punished her for trying to escape by

7 burning her forearm. PAPINI could not describe the object to the detectives but believed they

8 used something metal.[11]

9    q)      PAPINI's abductors provided her with a bucket, initially described as a trash

10 can, for her to use as a toilet. PAPINI suggested to her abductors that they put kitty litter in the

11 bucket, "I tried to say, you know, if you line it with a bag and put kitty litter in it, it will

12 probably make your job a little easier." PAPINI's abductors took her advice and lined the

13 bucket with kitty litter.

14    r)      PAPINI was given a shower twice while she was being held. PAPINI could not

15 recall the approximate days that she was given showers because she was unable to tell the

16 passage of time while she was in captivity.  PAPINI described the first shower as hurting her

17 because she had burns and open wounds. PAPINI described the bathroom as having a high-

18 pressured shower, the shower had light-colored speckled tile with a crack in it, there was no

19 shower curtain, and the shower head was chrome and "inexpensive." PAPINI's older abductor

20 stood at the door while the younger abductor stood behind PAPINI. PAPINI did not look at her

21 abductors because she was always told not to look at them. PAPINI was provided with a body

22 wash that smelled like coconut, but no shampoo. PAPINI first stated that she washed her

23 underwear in the shower, but later stated that she kept her underwear on while she showered

24 and only had a few seconds to wash herself. PAPINI was not provided with a towel to dry

25 herself. PAPINI tried to hit the younger abductor with something, but couldn't remember what

26

27 ───────────────────
[11] Some months later, after her interview with detectives, PAPINI sent a text message to an FBI
Agent working the investigation with a picture of a spoon. In the text message, PAPINI stated she
28 believed it was something similar to the spoon that was used to burn her arm.

it was that she used to hit her abductor. She stated, "I…tried to hit her with something in the bathroom…and then the next time I went in the bathroom…everything was gone. The mirror was gone, the towel rack was gone."[12]

  **s)**    Detectives asked PAPINI how her hair came to be cut. PAPINI told detectives that she did not know what led to her hair being cut. She believed it was in response to her making noise because she was moving and the cable affixed to the pole in the closet clanged. PAPINI stated that whenever she would make noise, "they would rush in." PAPINI had a hard time remembering that day and eventually recalled that she thought she "was trying to make the bed? I want to say I was smoothing out a blanket….and [the cable] made that noise?" PAPINI did not "feel" it was time for the "trash can" to be emptied on that day, and the "bigger one" came into her room and PAPINI dropped to the floor on all fours. She had her hair pulled back already in what she believed was her original hair tie. The two women said something in Spanish to each other, and "the other one was outside the room." PAPINI said she was hit on the shoulder and then yanked backwards, and she felt like "it happened really fast." After her abductor cut PAPINI's hair, she held it in her hand and stood over PAPINI. The woman told PAPINI, "I'm gonna send it to your mother." PAPINI did not know what was used to cut her hair.

  **t)**    SCSO detectives asked PAPINI about a blog post written by "Sherri Graeff" ("GRAEFF").[13] Many people in the Redding area speculated that PAPINI wrote the blog post, which was titled, "*Keep Walking.*" The post appeared to have been written sometime in 2007. In the post, GRAEFF detailed how she grew up in Shasta Lake, California, was a good athlete, but was picked on in high school by a group of "Latinos." The post stated, "I used to come home in tears, because I was getting suspended from school all the time for defending myself against the Latinos. The chief problem was that I was drug-fee, white and proud of my blood

---

[12] In a subsequent interview with an FBI Forensic Interviewer, PAPINI stated that the older abductor was walking back and forth while PAPINI showered. PAPINI also described in detail how she fought with the younger abductor and cut her foot in the process. In the hospital and ambulance interviews, PAPINI said that the older abductor told her that her "buyer" was a "cop" while PAPINI was showering.

[13] Sherri Graeff was PAPINI's maiden name.

and heritage. This really irked a group of Latino girls, which would constantly rag and attack me." The post detailed how GRAEFF fought the girls, and how it took "three full-sized men to pull me off her. I broke her nose and split her eyebrow." The post goes on to explain why it was titled "*Keep Walking*," because GRAEFF's father told her how proud he was of her after the fight with the other girls, and that she kept walking when her shin was split open as a result of the fight. GRAEFF concluded the post with, "Being white is more than just being aware of my skin, but of standing behind Skinheads – who are always around, in spirit, as well – and having pride for my country . . . ." Detectives told PAPINI it appeared the post was originally written on a MySpace page. When the detectives asked PAPINI if she had a MySpace account, PAPINI stated that she did not remember. PAPINI told detectives that prior to her kidnapping, she had hired an attorney to try and have the post removed.  PAPINI said she believed someone else had written the post using the name "Sherri Graeff" and described the post as "awful."

**D.    PAPINI's False Statements to Federal Investigators**

19.    On March 2, 2017, PAPINI conducted a forensic interview with an FBI Forensic Interviewer, which was recorded and transcribed in its entirety. This was the first interview conducted without Husband in the room. PAPINI stated that she continued to fear law enforcement and told the interviewer, who was a female, that she did not trust her. PAPINI kept her head down and looked at the floor for the majority of the interview. At the beginning of the interview, the interviewer stated, "I just ask everybody to tell me about the truth, okay?" PAPINI responded, "Okay." In the interview, PAPINI provided the following information:

a)    On the day she was abducted, PAPINI went out for a jog. She was able to recall that she was wearing black leggings, her black and white checkered Under Armor tennis shoes, and a Nike jogging hoodie with thumb holes. She said she left her house through the front door and ran down the driveway. She explained that she ran in the same direction every time and that she was training for a 5K race. PAPINI was able to describe the route she took and the people she saw on her way, ending with a right turn onto Sunrise Drive.

b)    PAPINI described her first encounter with her abductors. When she was "about mid-way in the dirt road between where Old Oregon Trail is and Sunrise Drive ends," she saw

a woman in a vehicle who was "asking for help or signaling in some way." Then PAPINI took out an earbud and "crossed the road to the left-hand side of the road" and the woman opened the door and pointed a gun at PAPINI.  PAPINI squatted down in the grass, and the woman said something like, "I don't want to hurt you."  PAPINI "set [her] phone down and then . . . pulled [her own] hair out and squished it in the headphones" and held her hands above her head. PAPINI described the vehicle her abductors were in as "a dark color, either like a dark, dark blue or a black" with "a long window in the back." PAPINI also said that there were four doors and the windows were tinted. PAPINI said that was "about all" that she could remember.

c)      Upon further prompting, PAPINI said that her abductor "was wearing a hat and sunglasses" and thought the hat was "light colored like a grey baseball cap." PAPINI said she knew her alleged abductors were Hispanic because their skin color was "Hispanic-colored, dark-colored skin." PAPINI explained that when the abductor shouted at her, PAPINI took one ear bud out, but could not remember which ear bud she had taken out. PAPINI was out of breath because it was the midpoint of her run, and had already run a mile, and had started "slowing [her] pace to walk up towards the grass." PAPINI described that the door of the SUV opened on the passenger side, and she saw a woman holding a gun, and described the gun as "a short revolver." PAPINI squatted with her head down when she saw the gun.  PAPINI explained the abductor told PAPINI to put down her phone and that "they don't want to hurt me."  PAPINI explained that she knew her family would find her phone and her intention was for her family to find her hair with her phone when they found her phone. Later in the interview, PAPINI explained that there may have been times when her abductors were not covering their faces. PAPINI stated, "I don't know. There could have been but I didn't look up . . . I was really scared . . . and the more I was on the ground or kept my head down, the less they would hurt me."

d)      PAPINI could not remember her abductor getting out of the car. The next thing PAPINI remembered was that she was in the back of the car. She could not remember how the door of the car was opened for her to get in or how she got into the car. PAPINI described how there was something over her head so she couldn't see and something bound her arms together

behind her, and her legs were bent behind her so she "could move them a little, not a lot." PAPINI said she was on the floor of the vehicle, facing the rear. She could hear two women talking, but they spoke in Spanish and PAPINI did not understand Spanish. The interviewer asked PAPINI to tell her what the abductors were saying. PAPINI responded, "It's not English. It's Spanish. I don't speak Spanish." The interviewer asked PAPINI what the tone of the abductors' voices was. PAPINI responded, "I don't know. They speak really fast . . . I would just say that it was a normal volume." PAPINI could not see anything of the inside of the vehicle or out of the windows because she had something over her head.  PAPINI said that, as they were driving, she could feel turns and was nauseous.  PAPINI kept falling asleep, "but, it was like a yucky feeling kind of sleep." The next thing PAPINI remembered was waking up in a room.

e)　　PAPINI described waking up in a room on a bed. The bed was a plain mattress on the floor, underneath a window. PAPINI's body was across the mattress, with her head towards the window and her feet hanging off the edge of the mattress. PAPINI stated her legs were no longer bound, but she had zip ties around her wrists. The room had a dresser in it along with the mattress, but nothing else. The next thing PAPINI remembered was breaking the zip ties off her wrists. "There's zip ties. Together on my wrists. That's what this little scar is from. Arms are in front." The interviewer noted that PAPINI's zip-tied arms moved from being bound behind her to in front of her, but PAPINI could not explain how that happened. PAPINI went on to explain that she and Husband had watched a YouTube video about how to break zip ties, and she tried the maneuver, but it did not work. Instead, PAPINI "bit them and just chewed the hell out of them and then [she] broke them."

f)　　The interviewer asked PAPINI about the clothing she had on when she woke up in the room. PAPINI said that she was wearing a plain t-shirt and her original underwear, no socks and no bra. PAPINI did not know what happened to her original clothing.

g)　　PAPINI said that after she got the zip tie off, she "stood on the bed and jumped up to pull the board off of the window" but there were also "boards on the outside" so she could not see outside. PAPINI could not say whether the window could open. She was only

able to get one board off before her abductors came into the room. When her abductors came

into the room after she got the board off the window, PAPINI "was pulled down from behind"

and "was hit very hard." PAPINI described how she felt a burning feeling from her hair being

pulled. PAPINI further described that she heard her abductors yelling as they came into the

room. She couldn't remember where her body landed after her abductors pulled her down, and

she didn't see anything because all she saw was stars. The very next thing PAPINI

remembered was that she woke up in the room, the dresser was gone and the mattress was now

where the dresser had been before, and she had a chain around her waist.

h)      PAPINI said she did not think about who would have abducted her and why;

instead, she was thinking about how she was going to get away. The next thing that happened

after she woke up with the chain around her waist was that the door opened and "a plate with

food and . . . [a] plastic bottle of water [was] put in the room. And then the door shut."

i)      PAPINI described her abductors: the "smaller one" had "dark," "curly hair

that's kind of short," so curly that "if she didn't put product in there it would probably be really

frizzy," and was wearing "brown shoes" that looked like "Guess knock offs" and blue jeans,

had pierced ears and wore "those big hoop earrings," and had thin, "almost drawn in"

eyebrows. The "bigger" abductor had "dark eyes, really thick eyebrows, and dark hair with

strands of grey."

j)      PAPINI went on to describe the food she was given, which was mostly grits, or

Cream of Wheat, on a "cheap" paper plate with ridges on it. She was not provided silverware,

so she folded the plate and "shoveled" the food into her mouth.  PAPINI said she got a lot of

scraps, sometimes bread, crackers, an apple, "leftover[s], from like meat, and some rice, black

beans, chunks of bread." The next thing PAPINI remembered was going to sleep.  PAPINI

said she was asleep for a very long time, waking every once in a while, and feeling sick and

dizzy.

k)      PAPINI said the first time her clothes were changed was after her first shower

and went on to describe events that occurred when she was given her first shower.  PAPINI

explained that she was sitting on the bed in the room when her abductors came in to take her to

the shower. They hit her on her head and hip, but she didn't know what they hit her with.  The "bigger one" had "her hair pulled back" and "a bandana around her face" and "the littler one" had on "a lacey mask." Both women "had their guns" and told PAPINI to not struggle or not move. PAPINI later explained that the "little one" held a "hand gun [that] wasn't a revolver" and the bigger one had a "different gun" that she always had either "in her hand or in her pants." The abductors unlocked the chain and brought PAPINI "around the corner to a bathroom, with water running." The "little one" stood at the door while the "bigger one" went "back and forth, in and out of the room." PAPINI took her clothes off, except her underwear, and used a coconut-scented body wash that the bigger one threw at her to wash herself and her clothes. PAPINI described the bathroom as being a small bathroom with a sink on the left, a towel rack on the right, and a combined shower and tub with a "cheap metal spigot," gray floor tiles, and brown wall tiles, and a crack in the shower tile. PAPINI said she tried to get her abductors to talk to her while she was in the shower, and asked her abductors, "Where am I. Why am I here?" but they did not respond to her. The "little one" had "a really thick accent" and "said, 'We sell you.'" The bigger one told PAPINI, "'Your buyer is a cop.'" Then when the abductors "were talking to each other, the big one said something to the little one and she . . . turned her body and lowered her gun," at which point PAPINI "jumped on her and shoved her face on the toilet."  PAPINI explained that it was "slippery" and she "slipped and cut [her] foot on the stupid side of the cabinet."  Then "the big one came in and dragged [PAPINI] back into the bedroom by [her] hair" and "shoved" a "bitter" liquid down PAPINI's throat until she "was choking and gagging." PAPINI explained that then the abductors hit her, locked her back up, and left the room. PAPINI put on clothes that had been laid out on the bed and laid her underwear out to dry.

   l)  PAPINI described the closet, chain and pole: "There's two doors that open outward," "two shelves," and a "really weird metal pole" that looked like a large screw that went through both shelves, which was "what the cable was attached to." PAPINI said she liked being in the closet because "it was warm" and when the closet doors were shut, the chain hooked on the pole did not make any noise that would alert her abductors, so she was free to

move and exercise. PAPINI explained that although she "was sore" and "hurt all the time," she needed to stay alert and wanted to "stay strong [so she] would do yoga and would move and stretch [her] legs." Also, "if [PAPINI] was outside of the closet, [she] could tuck the cable under [her] thigh and lift [her] other leg."  PAPINI also described how, while she was in the closet, she took a screw and was trying to chip away at the drywall.  She thought that if she could use the screw to chip at the drywall, she might be able to escape.

m)      PAPINI described how her abductors' behavior changed during the time she was in captivity, and said the "little one" changed a lot, but the "big one" was always "mean and cruel." PAPINI said that the "little one" would pull the "big one" off her sometimes when the "big one" was beating PAPINI, and the "big one" would hit the "little one." PAPINI explained that she did not know Spanish, but she "felt like [the little one] was protective."  PAPINI suggested to the "little one" that she line the trash can with a plastic bag and put kitty litter in it, and the "little one" did what PAPINI suggested. When the interviewer asked PAPINI if it was a bucket or a trash can, PAPINI responded, "It's a bucket, trash can . . . I mean it's a bathroom, it's like a little cylindrical latrine . . . It was grey, it had ridges on the outside."

n)      PAPINI described what happened when she was branded on her back.  PAPINI said the women brought a table into her room while she was on the bed. PAPINI described the table as heavy, and it made a loud "thunk" when the women set it down. The table was short to the ground and had a marble design, but the marble design was peeling, "so obviously, it was fake [because PAPINI] could see the brown wood underneath" the marble-like laminate.  The women put PAPINI on the table with the chain still around her waist with the cable attached. Her wrists were wrapped around the front of the table as if "hugging" it and her legs were not all the way on the table, with both her hands and legs tied to the table. PAPINI believed it was both women who put her on the table. PAPINI was wearing a tee shirt, and one of the two women, she wasn't sure which one, cut the tee shirt up the back. The two women were talking to each other in Spanish, and PAPINI looked away and closed her eyes. The "little one" was sitting to PAPINI's right and slightly behind her while the "big one" left the room and then came back and set "something" down. PAPINI was putting all her weight on her chest, which

AFFIDAVIT                                      23

hurt because of her breast implants. PAPINI said she was dizzy and nauseous. She kept moving and was hit every time she moved. PAPINI said the branding tool "made this awful popping noise" when it was put to her skin. PAPINI said it was hard to describe the feeling she felt when she was being branded.  She was scared of saying anything, and she did not want to make any noise.  She could not turn her head to see what the women used to brand her, and she kept her eyes closed. Once the women were finished branding her, PAPINI said, "She untied me, the little one, and then kicked me off the table. The little one dragged the table out, the big one stood there. And then she walked out." PAPINI still had her shirt on, but it was cut up the back. She fell asleep, and when she woke up, there was another shirt for her to put on, and the one that had been cut was gone.

o)   PAPINI said her hair was cut towards the beginning of her captivity. She was making noise and "the big one" "came in and grabbed [PAPINI] and pulled [her] hair back." The "little one" stood at the door.  The "big one" told PAPINI, "They're not looking for you…they're not going to find you," and told PAPINI she was going to send her hair to PAPINI's mother. PAPINI did not know what was used to cut her hair. PAPINI explained that she felt "really bad" and reasoned that her abductors did not "know" her because otherwise they "wouldn't send [her] hair to [her] mother, [but] would send it to [her] husband."

p)   In PAPINI's prior interviews with law enforcement, she discussed that her abductors read her articles and told her that nobody believed her, and that law enforcement was involved in her abduction. When asked about this, PAPINI stated that her abductors did not read her any articles or show her any news coverage, but instead told her while cutting her hair, "No one's gonna find you, they don't believe you, they think you just ran away, the police are not looking for you." When asked if she was worried nobody was going to believe her, PAPINI responded, "I was worried no one was going to find me."

q)   PAPINI described what happened on the day of her return. PAPINI was in her room and was on the bed, wearing sweatpants, a sweatshirt, her original underwear, and socks, and then she "heard a gunshot and [she] got really scared," saying, "I think I peed my pants actually." PAPINI said that she "got really scared" and "stayed in the closet." She heard

shuffling and the sound of keys being grabbed off a table, but nothing else and then she heard "the music." PAPINI said she "yanked on things" and screamed until she fell asleep in the closet. Then the "little one" came in and put food in the room. PAPINI ate the food and then felt dizzy, nauseous, and "yucky." PAPINI thought she felt bad because she wasn't eating or drinking much. The dizziness and nausea would happen whenever she would either sit up or stand. The next thing PAPINI remembered was that she fell asleep. The "little one" came back into PAPINI's room and woke her up by hitting her in the face. PAPINI did not know what she was hit with, but her nose was bleeding, although "it wasn't that much." The woman walked out of the room and the door was still open. There were clothes on the bed and "it seemed like she was instructing [PAPINI], so [PAPINI] put the other clothes on." Then the woman hit PAPINI again, put "something" on her head and unlocked the cable. PAPINI started walking and stubbed her toe. PAPINI did not remember if there were any restraints on her hands or feet. PAPINI was placed in a vehicle – she did not know if it was the same vehicle or a different vehicle as the vehicle from the day of her abduction because she could not see the vehicle due to the covering over her head. PAPINI described the vehicle as smelling different, that it smelled "like sewage and dirt." PAPINI was on the floor of the vehicle with her hands behind her, bound with "something metal" that was "very sharp." PAPINI did not hear any voices in the car, only the radio. She kept trying to count the songs, but she fell asleep. Then she felt the car stop, and she started crying. The "little one" instructed PAPINI, "Out!" PAPINI remembered hearing three clipping sounds, and the restraints on her wrists and ankles were cut. PAPINI fell out of the car and the car drove away. PAPINI pulled off whatever was over her head and ran after the car. PAPINI didn't know why she ran after the car, but explained, "I didn't want her to leave me." PAPINI could not provide any details of where she was dropped off in relation to where she was found, only that it was an agricultural road.

   r)     The interviewer asked PAPINI if PAPINI had any questions, and PAPINI asked, "Did they figure out what it says on my back?" referencing the branding on her back. The interviewer asked PAPINI if she had looked at it to see what it says, and PAPINI responded, "Eh, it's really hard to see, I have to look at a picture to look at it." The interviewer asked

PAPINI what she thought it said, and PAPINI responded, "I think it says Exodus, but I can't read the numbers." The interviewer asked PAPINI if she had any idea what any meaning might be for the brand. PAPINI responded, "No, I read it, but it's a really confusing bible passage. It's like a really weird part of the bible . . . it doesn't make any sense."

20.     On March 31, 2017, Husband contacted the FBI and provided the following information: PAPINI told Husband that the room in which she was kept had paneling similar to bead board on the bottom half of the wall and drywall on the top half. PAPINI described the carpet as orange-colored and shaggy. Husband provided photos of the drawings he made with PAPINI of the room and the device used to chain PAPINI to a pole in the closet in the room.

21.     On June 5, 2017, Husband contacted the FBI and provided the following information: Husband and PAPINI recently traveled north to Ashland and Medford, Oregon. PAPINI had no problem driving north and did not react negatively. While in Oregon, they went to a Dick's Sporting Goods store. While in the gun section of the store, PAPINI was fine until she saw the display of revolvers. When PAPINI saw the revolvers, she "shut down" and got scared. PAPINI pointed at a black Ruger revolver and said, "that's what it looks like." Husband informed the agents that PAPINI wanted to sit down with a sketch artist. Husband stated that PAPINI was seeing a plastic surgeon to have the burns on her arm repaired with laser treatments. During one of the treatments, PAPINI smelled the burned hair from the laser and "shut down," and the treatment had to be stopped.

22.     On June 8, 2017, PAPINI met with FBI agents to review a photo array.  In that meeting, PAPINI told the agents that the older woman who took her had bushy, thick eyebrows and the younger woman had curly hair and thin eyebrows that had been "over tweezed;" neither woman had a widow's peak.

23.     On June 22, 2017, PAPINI met with an FBI sketch artist to create renderings of the two Hispanic females who abducted her. During that meeting, PAPINI described the older woman as approximately two to three inches taller than PAPINI, with long smooth hair that she kept in either a braid or a ponytail that would hit PAPINI in the head whenever the woman leaned over her. She also said the older woman had fat hands and fingers with smooth skin and had "coffee breath" all of the time and smelled like she drank sweetened coffee. PAPINI described the younger female as having

1  coarse, curly hair with no bangs. She said the younger female was shorter, with a muscular build and

2  wider in her hip area – not thin, but not overweight. PAPINI told the FBI sketch artist that the younger

3  abductor wore large hoop earrings and had hairy arms. Both females were clean and smelled of

4  detergent. PAPINI provided the sketch artist with reference photos she had printed from the Internet to

5  show the skin condition of the older abductor and provide a reference of facial features and mask

6  placement for both abductors. PAPINI told the FBI sketch artist that both abductors wore masks when

7  they interacted with her. As such, the sketch artist left the bottom half of the abductors' faces un-

8  drawn and provided PAPINI with mask examples to use in the sketches.

9          24.    On June 27, 2017, the FBI sketch artist sent sample mask images and draft copies of the

10  sketches of the two Hispanic women with masks for PAPINI's approval. Based on PAPINI's

11  suggestions, second drafts of the sketches of the two Hispanic women were sent on July 3, 2017.  On

12  July 18, 2017, the FBI sketch artist received confirmation of PAPINI's approval of the two sketches.

13  On September 22, 2017, the sketches were finalized and submitted to be used in FBI Wanted posters

14  that were disseminated worldwide in the search effort for PAPINI's abductors.

15          25.    On August 14, 2017, Husband contacted FBI agents and provided the following

16  information:  Husband and PAPINI were recently talking about events that occurred during PAPINI's

17  captivity.  PAPINI described being bound to a black coffee table with a granite veneer or laminate top

18  that was cracked in the top right corner. PAPINI was bound lying face down on top of the table and

19  then was branded. Husband did a Google image search and found a picture of a table that PAPINI said

20  was like the table she was on. Husband provided this picture to FBI agents.

21          26.    On October 26, 2017, Husband and PAPINI met with FBI agents. Based on tips

22  received by the FBI following the release of the sketches, FBI agents showed PAPINI two mug shots

23  of two different women and five Facebook photos of a third woman. PAPINI did not identify the

24  women in the two mug shots. Though PAPINI could not positively identify the third woman from the

25  Facebook photos, she stated that the woman's eyebrows were like the ones of the younger female

26  captor.  PAPINI provided additional information regarding her captivity.  In the beginning, while

27  PAPINI was taking her first shower, PAPINI begged the younger woman to let her go and the older

28  woman walked past, holding something in her hands and making a "tsking" or hissing sound at

1  PAPINI.  The younger woman said, "We sell you" and "Buyer is cop."[14]  PAPINI stated that this was
2  the only time a cop was mentioned.  While PAPINI was using the shower, she heard the older woman
3  use the Spanish word "métate." During that first shower, PAPINI fought with the younger woman.
4  PAPINI cut herself on something in the bathroom and had "a lot of cuts" at that time. Also, during the
5  fight, PAPINI saw "a pointy canine" through the younger woman's mask. When PAPINI was tied to
6  the coffee table being branded, she heard the following Spanish words being spoken by the older
7  Hispanic woman: deja, puta, mira and friolenta. The older woman said the word "friolenta" directly to
8  PAPINI in a derogatory manner, showing disgust towards PAPINI, but the younger Hispanic female
9  did not show disgust. During the branding, PAPINI yelled out and was hit. The older Hispanic female
10 was touching PAPINI's body with her fingers.  Additionally, PAPINI discussed her November 2016
11 text conversation with Man 1 about meeting together and explained that the text regarding having an
12 additional plan was about making another dinner plan with her friend so PAPINI could get out of the
13 house to meet Man 1 without suspicion from Husband.

14       27.    On November 8, 2017, PAPINI met with FBI agents to review a photo array of possible
15 subjects. PAPINI did not positively identify any of the individuals in the photos but did provide
16 additional information. PAPINI further described the younger captor as having defined curls with a lot
17 of product that sometimes looked "crunchy" and rarely lost definition, as well as a wispy hairline.
18 PAPINI found three pictures from the Internet that looked similar to the younger woman's hair and
19 hairline and provided these pictures to the agents. PAPINI stated that certain SUV models – Tahoes
20 and Suburbans – made her stomach hurt and described the vehicle in which she was abducted as
21 having a rear door that lifted like a hatchback or SUV. Husband showed agents a photo of PAPINI's
22 foot taken at the hospital the day she was found, which Husband asserted showed a mark on the side of
23 PAPINI's right foot, corroborating PAPINI's recollection regarding the fight she had with the younger
24 captor in the bathroom. PAPINI stated she stepped onto the edge of the tub and "flung" herself
25 towards the younger captor. PAPINI scraped her foot on the bottom of the sink along the baseboard of
26 the vanity. The scrape bled a little but was not "dripping." PAPINI admitted that she exaggerated the

27 _____
      [14] In her previous interview with an FBI agent, PAPINI stated that the older one had stated that
28 the buyer was a cop.

incident in an earlier interview and apologized that she "pumped up" the description. PAPINI stated she did not see the photo Husband showed the agents before describing the injury to Husband, which prompted Husband to go back and look at the photos of PAPINI's injuries that he received from the SCSO.

28.     On March 16, 2018, PAPINI contacted FBI agents and stated that during a session with her therapist, PAPINI recalled additional information.  PAPINI came to believe the burns on her arms were made with heated up kitchen utensils such as the "back end" of a butter knife or spoon.  PAPINI had silverware at home that matched the scars on her arms. PAPINI was asked to provide pictures but could not at the time as she and her husband were preparing to take a trip to a hunting cabin out by Platina, California, where there would be no cell reception.

29.     On March 21, 2018, PAPINI sent FBI agents a text with a photo of a spoon. In the text message, PAPINI stated, "I don't recall seeing anything other than the shine. But now that we look closer you can see the first spot she touched it to my skin when I jerked away and that it appears to be drag marks? The second when I flinched and the deep mark when she held my arm and pressed it in and held it there."

30.     On May 7, 2018, Husband contacted FBI agents and stated that during a therapy session, PAPINI remembered that one of the women holding PAPINI captive tried to pour a sticky substance down her mouth. PAPINI wiped her mouth off with her underwear leaving a sticky substance on the underwear and then fell asleep.

**E.     <u>FBI's Discovery that PAPINI Had Actually Been with a Former Boyfriend</u>**

31.     On September 26, 2019, SCSO detectives submitted a letter to CA DOJ, BFS requesting a familial DNA search for the unknown male DNA contributor identified on PAPINI's underwear.  On March 19, 2020, the CA DOJ Familial Search Committee voted to release a familial search result to provide analytical assistance in an effort to identify the unknown male DNA.

32.     On March 19, 2020, the CA DOJ, BFS, Redding Laboratory received an email identifying Person 2 as a potential relative of the unknown male DNA contributor identified in PAPINI's clothing. Person 2 had two living biological sons, one of whom was Ex-Boyfriend.

33.     An investigation into Ex-Boyfriend revealed that he was briefly associated with an address owned by PAPINI's parents. Additionally, the investigation revealed that Ex-Boyfriend and PAPINI were joint subscribers to an America Online (AOL) email account, and also that Ex-Boyfriend and PAPINI had conducted historical financial transactions together.

34.     In July 2020, FBI Special Agents reviewed Ex-Boyfriend's brother's social media pages and identified a table similar in appearance to the table PAPINI described to law enforcement in August 2017 as the table her abductors strapped her to and branded her on.

35.     On June 9, 2020, FBI Special Agents collected discarded items from the trash can outside of Ex-Boyfriend's residence in Costa Mesa, including a discarded Honest Honey Green Tea bottle. These items were provided to the CA DOJ, BFS, Redding Laboratory for analysis. On July 10, 2020, CA DOJ, BFS, Redding Laboratory concluded that the DNA obtained from the mouth area of the Honest Honey Green Tea bottle matched the unknown male DNA collected from PAPINI's clothing.

36.     On August 10, 2020, investigators interviewed Ex-Boyfriend, and he told them the following:

     a)     Ex-Boyfriend admitted to investigators that he helped PAPINI "run away."  Ex-Boyfriend explained that PAPINI was "a good friend" and she had asked him for help.  PAPINI told him that her husband was beating and raping her and she was trying to escape.  PAPINI told Ex-Boyfriend that she had filed police reports, but the police were not doing anything to stop her husband's abuse.[15] Ex-Boyfriend said "she had something planned up" and he was trying to help her get away from Husband and be a good friend. Ex-Boyfriend and PAPINI had known each other since they were 13 or 14 years old and had a long history together as friends. The two also had a romantic relationship and had previously been engaged. Ex-Boyfriend told investigators that PAPINI reached out to him "out of the blue," and that they had not spoken in a long time because "she got married, she had kids." Ex-Boyfriend estimated that sometime in 2015, he was cleaning his house and came across a box of old photos and personal items that

---

[15] The SCSO did not have any domestic violence reports filed by PAPINI against Husband.

belonged to PAPINI from when they were in a relationship together. Ex-Boyfriend sent the box of PAPINI's personal items to PAPINI's parents, and then called her parents to let them know the box was coming. Ex-Boyfriend did not know if his sending PAPINI's personal items back to her parents was what prompted PAPINI to reach out to him. When PAPINI first called Ex-Boyfriend, he was at work. PAPINI told Ex-Boyfriend she had a plan to run away to him, and that she had been saving some of her cash and planned to send some money to Ex-Boyfriend for her to have when she was with him. Ex-Boyfriend stated, "she kind of laid out the situation." PAPINI did not get into a lot of detail and the call was brief because Ex-Boyfriend was at work.

b)   PAPINI told Ex-Boyfriend to get a prepaid phone to communicate with her. Initially, PAPINI and Ex-Boyfriend called each other on their regular phones, but eventually they began to communicate on prepaid phones that were not attributable to either of them. PAPINI devised a plan for Ex-Boyfriend to drive to Redding and Ex-Boyfriend agreed.  Ex-Boyfriend admitted to investigators that "there could have been a better plan," and said the planning process was not very long. Investigators asked Ex-Boyfriend if there were any females involved in helping PAPINI escape, and Ex-Boyfriend said "no." Investigators asked Ex-Boyfriend if he had seen the sketches of the women who allegedly abducted PAPINI, and Ex-Boyfriend responded, "Yeah, yeah, no, I don't know any Mexican girls."

c)   Ex-Boyfriend initially could not recall how he knew where to pick up PAPINI. Later in the interview, Ex-Boyfriend recalled that PAPINI sent him a care package that included the location where she wanted him to pick her up. In the summer of 2016, Ex-Boyfriend and PAPINI "had been talking," and Ex-Boyfriend let PAPINI know he was in the hospital.  PAPINI sent a care package to Ex-Boyfriend's residence after he had been home from the hospital for a while. Included in the care package was a piece of paper with the location where PAPINI wanted Ex-Boyfriend to pick her up. Ex-Boyfriend thought he must have "Googled" the location to get an idea of where to go.

d)   Ex-Boyfriend asked a friend, Person 3, to rent a car for him to use, but did not explain why he needed the car. On October 31, 2016, Person 3 rented a dark-colored Dodge

Challenger for Ex-Boyfriend.[16] Ex-Boyfriend did not specify what kind of car Person 3 should rent but did not expect Person 3 to rent a sports car. Ex-Boyfriend told investigators that, on November 2, 2016, he got up early in the morning and drove the rented Dodge Challenger from Southern California to Redding, California. When Ex-Boyfriend got to Redding, he went to Trader Joe's and bought some "stuff" and ate breakfast. He stopped at a Starbucks and waited to hear from PAPINI about where he should drive to meet her.  Ex-Boyfriend believed PAPINI communicated with him on his prepaid phone using a prepaid phone she already had.  PAPINI sent Ex-Boyfriend a text message detailing where she wanted Ex-Boyfriend to pick her up.  Ex-Boyfriend recalled he picked PAPINI up on a street called "Old something" just outside of Redding.[17] Ex-Boyfriend described that as he was driving up the road, PAPINI was walking down the road. Ex-Boyfriend pulled up to PAPINI, opened up the passenger side door of the vehicle and folded the front seat down so that PAPINI could get into the back seat.  PAPINI was wearing athletic clothes when Ex-Boyfriend picked her up.  She had been jogging and was "all sweaty." PAPINI got into the vehicle and laid down in the back seat. Ex-Boyfriend drove straight back to Southern California, stopping only a few times for gas and coffee.  PAPINI stayed in the back seat of the vehicle the entire length of the trip.  Ex-Boyfriend and PAPINI did not talk much during the drive back down to Costa Mesa. Ex-Boyfriend recalled that PAPINI was worried about her kids, and was having a hard time with that, but otherwise the ride was "fairly quiet." Ex-Boyfriend recalled that PAPINI "took a nap" and slept for most of the drive.

e)     During the period of her disappearance, PAPINI never left Ex-Boyfriend's residence. PAPINI asked Ex-Boyfriend to pick up clothes for her to wear.  Ex-Boyfriend purchased sweats, socks and t-shirts from Target, TJ Maxx, or Ross – wherever he was closest

---

[16] Documents obtained during the investigation confirmed that Person 3 rented a silver Dodge Challenger from Fox Rent-A-Car on October 31, 2016, at approximately 6:37 p.m. The rental car was returned on November 4, 2016, at approximately 10:00 a.m.

[17] On the date of her disappearance, PAPINI's cell phone was found near the intersection of Old Oregon Trail and Sunrise Drive.

to on his way home from work. Ex-Boyfriend said he did not buy much clothing for PAPINI, and bought "grays, darks, basics whatever they had."

f)      Ex-Boyfriend continued to go to work every day while PAPINI stayed at the residence. Ex-Boyfriend slept on the couch in the living room and PAPINI had her own room. Ex-Boyfriend lived in a two-bedroom apartment, and PAPINI selected the room she wanted to stay in. Ex-Boyfriend believed PAPINI purposefully selected the room with "less exposure." Ex-Boyfriend told investigators that it might sound "bland," but they really just "talked," "hung out," and "ate food," but they did not go anywhere. PAPINI cleaned the house a couple of times and did whatever she thought she needed, and that "she was feeling for herself, you know, she was in her own thing." PAPINI "had a lot of private time," and "just wanted to be in the room with the door shut."  Ex-Boyfriend was not there most of the time.

g)      The closet of the room Ex-Boyfriend described as PAPINI's room looked very similar to the closet PAPINI described in her previous interviews with law enforcement, and included a pole as described by PAPINI.[18]

h)      During their interview with Ex-Boyfriend, investigators asked him if PAPINI did anything with the window in the room she stayed in at his house. Ex-Boyfriend told investigators there were boards over the window, "so she couldn't see, there was no light coming in, she wanted it to be dark."[19]  Ex-Boyfriend said he put the boards over the window because PAPINI asked him to and stated, "She asked me if there was a way to seal the window up." Ex-Boyfriend described the wood he used to cover the windows as "three sheets of particle board or press board." Ex-Boyfriend showed investigators that there was no other reason to board up the window because no neighbors or people from the outside could see into the window. PAPINI had stayed with Ex-Boyfriend for "a couple days" when she asked him to put boards over the window.

---

[18] When PAPINI was interviewed on November 28, 2016, she stated, "The cable was affixed to a pole that went into the ceiling;" and described the pole as "a big screw." This matched the pole in the closet of the room PAPINI stayed in at Ex-Boyfriend's residence.

[19] PAPINI described a window in the room she was held captive in as having been covered with boards.

i)      Ex-Boyfriend believed PAPINI was purposefully trying to lose weight while she was staying with him. PAPINI ate whatever Ex-Boyfriend bought, but would eat small portions.  Ex-Boyfriend stated, "She was not eating as much as she would…she would just minimize what she was eating."  Both Ex-Boyfriend and PAPINI made food for them to eat, but PAPINI would, for example, eat a half of a banana instead of a whole banana.  Ex-Boyfriend said that PAPINI was already "tiny," but she wanted to lose weight and he did not question her on it.

j)      Investigators asked Ex-Boyfriend what happened with PAPINI's hair.  Ex-Boyfriend told them that she "chopped that."  Ex-Boyfriend came home from work one day and PAPINI had cut her hair.  Ex-Boyfriend could not remember what PAPINI did with the hair she cut off and did not know if she had thrown it in the trash.  Ex-Boyfriend recalled that PAPINI cut her hair within a few days of coming to stay with him. Ex-Boyfriend believed that cutting her hair was one of the first things PAPINI did while she was staying with him.

k)      Ex-Boyfriend knew about the injuries PAPINI had when she was discovered. Ex-Boyfriend explained that PAPINI created the injuries while staying with him, including hitting herself to create bruises and burning herself on her arms. Ex-Boyfriend said he helped her create some of the injuries, although he never laid his hands directly on her; for example, she told him, "'bank a puck off my leg,' so [he] shot a puck off her leg, lightly."  Ex-Boyfriend did not help PAPINI burn her arm and said, "That was self-inflicted . . . I didn't burn anything on her arm there."[20] Ex-Boyfriend admitted to investigators he was confused by PAPINI injuring herself, and stated, "there's not too many people that come up and say – hurt me.  I'm not physical ever with women, I mean I just don't." PAPINI did not start creating injuries on herself until close to the time she was deciding to leave Ex-Boyfriend and go back home.  Ex-Boyfriend believed PAPINI had initially planned to stay with him for a longer period of time.

l)      Ex-Boyfriend described to investigators how PAPINI asked him to brand her. PAPINI told Ex-Boyfriend to purchase a wood burning tool from Hobby Lobby. The nearest

---

[20] The details of PAPINI's injuries were not told to the public.

Hobby Lobby was in Huntington Beach, so Ex-Boyfriend drove to the Hobby Lobby in Huntington Beach and bought the tool. By this time, PAPINI was aware of the news stories about her disappearance and did not want people to see her. Ex-Boyfriend clarified that he and PAPINI did not watch television because he did not have a television at the time, but PAPINI had a cell phone she used to read the news. PAPINI did not go with Ex-Boyfriend to Hobby Lobby because she never left the house during the time she stayed with him. Ex-Boyfriend told investigators he used cash to purchase the wood burning tool. Ex-Boyfriend described the wood burning tool as a small plug-in tool similar in size to an electric toothbrush. The letters snapped into the top of it and the rod heated up like a soldering iron. Ex-Boyfriend believed the letters were made of brass. When Ex-Boyfriend returned with the wood burning tool, he and PAPINI sat on the floor next to an electrical outlet so they could plug the tool into the outlet. Ex-Boyfriend sat behind PAPINI, and PAPINI pulled her shirt up so that Ex-Boyfriend could use the tool to make the brand. PAPINI told Ex-Boyfriend the phrase that she wanted burned onto her skin. Ex-Boyfriend couldn't remember the phrase, but it had meaning to PAPINI. Ex-Boyfriend recalled that he branded PAPINI's right shoulder using the wood burning tool.[21] Ex-Boyfriend recalled it was PAPINI's right shoulder because he was left-handed, and used his right hand to hold PAPINI's right arm and rested his left hand on her back so as to hold the tool steady. Ex-Boyfriend said he was nervous and wanted to hold steady while doing the brand because the tool was so hot it glowed red. Ex-Boyfriend wanted to do a good job and make the brand straight, but knew it must be painful, and did not want to hold the hot brand on PAPINI's skin for too long. Ex-Boyfriend was worried the branded area would get infected, but PAPINI never really complained about the pain. Ex-Boyfriend believed he purchased some burn cream for PAPINI to use on her brand and burn wounds. When asked whether she took off her shirt for the branding, Ex-Boyfriend explained she did, but that she was not generally walking around naked, although he knew about her breast implants and that she was having issues with them. Ex-Boyfriend recalled that PAPINI asked him to put the

---

[21] The details of the branding on PAPINI's right shoulder were not made known to the public.

brand on her within the first week she was with him. Ex-Boyfriend had wanted to keep the wood burning tool, and thought he might use it to "work on wood or something," but PAPINI told him to throw it away, and he did.[22]

m)      Ex-Boyfriend described how PAPINI got "some type of rash, at one point, on her arms." Ex-Boyfriend did not know what to do, so he went to the store and bought "all the different creams for rashes." PAPINI had given him a list and he "just picked up whatever and [he] grabbed extra ones." PAPINI wanted to scrub the stains out of Ex-Boyfriend's carpet and asked Ex-Boyfriend to go to Walmart and buy cleaning supplies. PAPINI "had been scrubbing the floor" and ended up having hives on her arms. Ex-Boyfriend did not know what caused the rash or what she was allergic to. Ex-Boyfriend believed PAPINI got the rash "pretty early on" when she was staying with him. Even though Ex-Boyfriend bought ointment for her to use, PAPINI continued to have the rash the rest of the time she stayed with him.

n)      Ex-Boyfriend explained that he and PAPINI had been in a previous romantic relationship that ended approximately in 2006. Ex-Boyfriend said that he wasn't sure of PAPINI's intentions during her stay with him, but he believed they might end up in a romantic relationship again. Ex-Boyfriend stated that he did not know how long PAPINI planned to be away from her family or "what the final plan was" and whether that included them getting back together. He said that during their prior relationship, they "were in love at a time, but that was young love." Ex-Boyfriend stated that he and PAPINI did not have sex while she stayed with him and said that "it was not a sexual thing."

o)      Shortly before Thanksgiving 2016, PAPINI asked Ex-Boyfriend to take her back to Redding. PAPINI said she missed her children and wanted to go home; she told Ex-Boyfriend, "I'm ready to go."  Ex-Boyfriend asked his friend, Person 3, to rent a car for him again, which Ex-Boyfriend used to drive PAPINI back home.  Ex-Boyfriend believed he and PAPINI left late in the evening the day before Thanksgiving or very early in the morning on

---

[22] Ex-Boyfriend later went with investigators to Hobby Lobby and showed them the type of tool he purchased and the lettering used with the tool. The lettering appeared to matched the letters that were branded on PAPINI's right shoulder when she was discovered.

Thanksgiving Day and drove straight through without stopping towards Redding. PAPINI stayed in the back seat of the rental car for the entire length of the trip, which took approximately seven hours. Ex-Boyfriend said he did not drop off PAPINI on the side of I5, but on a road off of the freeway. Ex-Boyfriend described the road as a country road alongside an orchard. The road was dark with no lights, and "was pretty barren in that area." Ex-Boyfriend drove back to Orange County and attended Thanksgiving dinner at his aunt's house in San Pedro at approximately 11:00 a.m. or 12:00 p.m. Ex-Boyfriend returned the rental car the next day.[23]

p)     Ex-Boyfriend said that PAPINI "had stuff in a bag" with her when they drove back to Redding. PAPINI used these items to bind her own wrists and ankles, including a chain that he likely purchased for her. Additionally, Ex-Boyfriend stated that PAPINI brought a prepaid phone with her, which she tossed out of the car as they drove back to Redding. Ex-Boyfriend described the phone PAPINI brought with her as a black smart phone, such as an Apple iPhone or Samsung phone. Before PAPINI left Ex-Boyfriend's residence, she bagged up anything that could be traced to her and threw the bag of her belongings in the dumpster outside Ex-Boyfriend's residence.

q)     Ex-Boyfriend told investigators that his Cousin and the Cousin's spouse ("Person 4") knew PAPINI was staying with him. Ex-Boyfriend told Cousin that PAPINI was going to come stay with him before Ex-Boyfriend went and picked PAPINI up. One night when Cousin had been drinking, Cousin tried to come into Ex-Boyfriend's house through the back door, and Ex-Boyfriend had to remind Cousin that PAPINI was there and that Cousin could not come over. Ex-Boyfriend also said that he told his mother that PAPINI was staying with him, but she did not know the details. Ex-Boyfriend explained that his mother became

---

[23] Documents obtained during the investigation confirmed that Person 3 rented a white Mitsubishi Outlander from Enterprise Rent-A-Car on November 23, 2016, at approximately 8:02 a.m. The rental car was returned on November 25, 2016, at approximately 7:00 a.m. The rental car had been driven approximately 927 miles during the period it was rented. This is just over the approximate roundtrip distance between Ex-Boyfriend's residence and Woodland, California, where PAPINI was found.

concerned and called Ex-Boyfriend after she started to see the news stories about PAPINI's disappearance.

r)      Ex-Boyfriend described himself as being "rattled" by his experience with PAPINI and was concerned about what his involvement with her meant for him. At the time PAPINI was with him, he believed he was helping out a friend. It did not occur to him that he could get in trouble until he started seeing the news stories regarding PAPINI's disappearance and her allegations that she had been kidnapped. Ex-Boyfriend said, "Once it hit like, you see everything on the news, but then, when it starts getting to the bigger . . . alright we're dedicating 20/20 [to PAPINI's disappearance]." Ex-Boyfriend was surprised by the news stories and told investigators that at one point he thought to himself, "I'm not going to make any calls because it's like I'm turning myself in for nothing." Ex-Boyfriend said he figured if the truth was discovered about PAPINI's disappearance, law enforcement would come to him, and he would not fight it. Ex-Boyfriend did not know there were money rewards for PAPINI's return until "long after" PAPINI left. Investigators asked Ex-Boyfriend if he had spoken to PAPINI since he drove her back to Redding, and Ex-Boyfriend stated, "I haven't talked to her since then."

**F.      Independent Evidence Corroborating Ex-Boyfriend's Interview**

37.      During his interview, Ex-Boyfriend provided details to investigators about PAPINI's injuries that were not known to the public, which tended to indicate that he did have first-hand knowledge related to PAPINI's disappearance. Through subsequent investigation, investigators were able to corroborate Ex-Boyfriend's account in additional ways.

38.      Telephone records show that Ex-Boyfriend and PAPINI were in telephonic contact using their known phone numbers approximately 29 times from December 2015 through March of 2016, prior to PAPINI's disappearance.

39.      Ex-Boyfriend's work schedule showed him off work on November 1 and 2, 2016, which were not his normal days off. This matches the dates he drove to Redding to pick up PAPINI.

40.     Rental car receipts show that Person 3, as Ex-Boyfriend described in his interview, rented a silver Dodge Challenger in Costa Mesa, California, on October 31, 2016, at 6:37 p.m.  The rental car was returned on November 4, 2016, at 10:00 a.m.

41.     Rental car receipts show that Person 3, as Ex-Boyfriend described in his interview, rented a white Mitsubishi Outlander in Santa Ana, California, on November 23, 2016, at 8:02 a.m. The vehicle was returned on November 25, 2016, at 7:00 a.m., after having been driven 927 miles. This is just over the approximate roundtrip distance between Ex-Boyfriend's residence and Woodland, California, where PAPINI was located after her disappearance.

42.     The table PAPINI described being tied to when she was branded matched in appearance to a table in a Facebook post by Ex-Boyfriend's brother, which was taken at Ex-Boyfriend's residence. When investigators met with Ex-Boyfriend in August 2020, Ex-Boyfriend confirmed that he used to own such a coffee table.

43.     In an interview in 2017, PAPINI described the room where she was held and sketched the closet, which matched in appearance to the bedroom in Ex-Boyfriend's residence that Ex-Boyfriend said PAPINI stayed in while she was with him. The closet in PAPINI's room at Ex-Boyfriend's residence had a lag bolt through the shelves of the closet, similar to the sketch created by PAPINI.

44.     According to records from Pinterest, on or before November 6, 2016, PAPINI pinned photographs of woodburning tools to a "Secret Board" titled "Gift Ideas."

45.     Ex-Boyfriend told investigators that PAPINI told him to purchase prepaid phones so that they could communicate with each other using phones that would not be attributable to them.  Ex-Boyfriend could not recall the numbers of the prepaid phones they used and said that PAPINI threw her phone out of the vehicle's window as Ex-Boyfriend was driving her back home. The investigation revealed two prepaid phones that were in communication with one another prior to PAPINI's disappearance and were both near the location of PAPINI's disappearance at approximately the same time as PAPINI's disappearance.

    a)     Toll record analysis identified phone number (XXX) XXX-7250, a prepaid phone number ("PHONE 1") as being a phone number that contacted both Ex-Boyfriend's and

PAPINI's known phone numbers prior to PAPINI's disappearance. AT&T records revealed that PHONE 1 was purchased by Ex-Boyfriend in approximately December 2015, and was used almost exclusively to contact another prepaid phone, (XXX) XXX-6318, ("PHONE 2").

b)      AT&T records revealed that PHONE 2 was purchased in approximately March 2016 and was used almost exclusively to contact PHONE 1. No name was provided at the time PHONE 2 was purchased; however, the billing address used at the time of purchase belonged to Ex-Boyfriend.

c)      Historical cellular site analysis showed that PHONE 1 primarily connected to cellular towers near the geographical locations of Ex-Boyfriend's residence and workplace in Southern California.

d)      Historical cellular site analysis showed that PHONE 2 primarily connected to cellular towers near the geographical location of PAPINI's residence in Redding, California.

e)      Historical cellular site analysis showed that on the evening of November 1, 2016, PHONE 1 traveled north from Southern California to Redding, California.

f)      Investigators obtained cellular tower records for November 2, 2016, the day of PAPINI's disappearance, from the cellular tower that was closest to both PAPINI's residence and the location of her disappearance. The records revealed that both PHONE 1 and PHONE 2 connected to that cellular tower on that date. Additionally, cellular tower records showed both PHONE 1 and PHONE 2 were used and in contact with one another at approximately the same time PAPINI was believed to have disappeared. On November 2, 2016, at approximately 10:57 a.m., PHONE 1 sent a text message to PHONE 2.

g)      Historical cellular site analysis showed that on November 2, 2016, after the text message, both PHONE 1 and PHONE 2 traveled south along Interstate 5 from Redding towards Bakersfield.

46.     As discussed in more detail below, investigators interviewed PAPINI on August 13, 2020, shortly after they spoke with Ex-Boyfriend. Toll records indicate that PAPINI reached out to Ex-Boyfriend in the months after that interview.

a)     On September 18, 2020, phone number (XXX) XXX-6607, a phone number that resolved to a business owned by PAPINI's parents, called Ex-Boyfriend's known phone number four times. This same phone number, (XXX) XXX-6607, also called Ex-Boyfriend's known phone number two times four days later, on September 22, 2020.

b)     On October 30, 2020, phone number (XXX) XXX-4224, a phone number that AT&T records listed as registered to PAPINI's home address, called Ex-Boyfriend's known phone number four times.

47.    On August 10, 2020, investigators interviewed Person 4, Cousin's spouse. Person 4 and Cousin lived across the street from Ex-Boyfriend in 2016 during the time of PAPINI's alleged abduction. Person 4 admitted to investigators that Person 4 knew PAPINI stayed with Ex-Boyfriend during the time when she was missing and Ex-Boyfriend told Person 4 that PAPINI had a bad relationship with her husband and was trying to get away. However, Person 4 did not see PAPINI when she stayed with Ex-Boyfriend. Person 4 said that Ex-Boyfriend kept it "locked up" and Person 4 did not go over to Ex-Boyfriend's house while PAPINI was there. Person 4 and Cousin hardly saw Ex-Boyfriend while PAPINI was staying with him, which was not normal behavior for Ex-Boyfriend. Ex-Boyfriend normally would come over to Person 4 and Cousin's house to see their kids and play hockey with them. Once PAPINI left, Ex-Boyfriend started coming back over to their house.

48.    On August 11, 2020, SCSO detectives telephonically interviewed Cousin. Cousin told SCSO detectives that approximately a week prior to PAPINI's disappearance, Ex-Boyfriend told Cousin that PAPINI was in an abusive relationship and law enforcement was not investigating the alleged abuse incidents. Cousin knew PAPINI from her original relationship with Ex-Boyfriend years ago. Cousin knew PAPINI was at Ex-Boyfriend's residence for several weeks during her disappearance. Ex-Boyfriend asked Cousin and Person 4 not to come to his residence while PAPINI was there. Cousin believed Ex-Boyfriend bought PAPINI a cell phone. Any time anyone was near Ex-Boyfriend's residence, PAPINI would call Ex-Boyfriend and Ex-Boyfriend would call Cousin to run off whoever the person was. Cousin ran off several people during this time, including random neighbors, delivery drivers, the landlord and the maintenance workers. Cousin stated that Cousin saw PAPINI on two separate occasions. On the first occasion, Cousin was walking down the driveway of

Cousin's residence, and saw PAPINI standing in the window of Ex-Boyfriend's apartment.  When

PAPINI saw Cousin, she immediately retreated back into the residence. On the second occasion,

Cousin went to Ex-Boyfriend's house late at night, which was normal prior to PAPINI being there.

Cousin forgot PAPINI was at Ex-Boyfriend's house, and entered Ex-Boyfriend's back door.  When

Cousin entered the residence, Cousin saw PAPINI in the living room before she ran into a rear

bedroom. Cousin also told SCSO detectives that Ex-Boyfriend said that PAPINI was hurting herself.

Ex-Boyfriend told Cousin that PAPINI asked Ex-Boyfriend to punch her in the face, but Ex-Boyfriend

refused to do so.  Ex-Boyfriend told Cousin that PAPINI cut her hair and had purposefully hit her head

on the bathtub and the bathroom floor.

### G.   PAPINI's Continued Lies Upon Confrontation (Count One – Section 1001(a)(2))

49.   On August 13, 2020, an FBI agent and SCSO detective (collectively, "investigators")

interviewed PAPINI.  Husband sat in on the interview.  The interview was recorded and transcribed in

its entirety.  At the beginning of the interview, investigators stated, "All we want is truthful statements

because it's a crime to lie to federal officers. Understood?" PAPINI nodded her head in agreement.

PAPINI nevertheless continued to make false statements regarding her supposed abduction.

a)   Investigators asked PAPINI if she could detail the differences in her two

abductors, and PAPINI stated falsely, "The younger one is the one that let me go and was the

nicer of the two. The older one was really abusive and really mean and is the one that did all

the really terrible things."

b)   Investigators presented PAPINI with the picture of the coffee table PAPINI had

previously provided as the type of coffee table on which she was branded, and asked PAPINI if

she remembered the coffee table. PAPINI responded, "Yes I do. I do remember that."

Investigators showed PAPINI the picture of the similar coffee table found on Ex-Boyfriend's

Facebook page. PAPINI stated, "It's been a really long time, so like details and things like

that, we did the best that we could to take notes on it and all that but a lot of it's really hard."

Investigators showed PAPINI a photographic lineup of Hispanic women, none of whom

PAPINI recognized as her abductors.

1       c)      Investigators showed PAPINI a series of photographs from Ex-Boyfriend's

2   residence, and she falsely denied it was the location she was at when she was "missing."

3   Investigators showed PAPINI a picture of the closet in Ex-Boyfriend's house with the pole

4   through the shelving, and the picture that PAPINI drew of the closet with the pole in previous

5   interviews with law enforcement. PAPINI responded, "It's a little bit different but it's pretty,

6   excuse my language, it's pretty fucking similar. But, it's different…It didn't look like that…It

7   didn't look like that." Investigators showed PAPINI a photograph of the window in the room

8   Ex-Boyfriend described as PAPINI's room. PAPINI responded, "I feel like this wood paneling

9   is too thick........ I remember it going all the way up to the window, is what I'm having trouble

10  remembering." Investigators showed PAPINI a photograph of the bathroom at Ex-Boyfriend's

11  residence, which matched the layout PAPINI had previously described to law enforcement.

12  PAPINI responded, "I mean this doesn't look like the bathroom to me but the order is, yes, this

13  is the type of order, but this is not what it looked like to me...... there was tile in the tub, there

14  was a crack." Investigators showed PAPINI a photograph of the tile in Ex-Boyfriend's

15  bathroom where it was cracked.  PAPINI stated, "I don't know."  Investigators asked PAPINI if

16  she remembered what she previously said about a screw she used to drill through the drywall in

17  the closet while she was abducted. PAPINI stated, "I dug a hole into the wall and poked it into

18  the wall." Investigators showed PAPINI a photograph of a hole in the closet of Ex-Boyfriend's

19  house.  PAPINI stated, "It was into drywall but....... No."

20      d)      Investigators then explained that they were showing PAPINI the photographs of

21  the house they had discovered she had been staying at, and they had spoken to the family who

22  knew that she was there. PAPINI responded, "Oh my God." Investigators asked PAPINI if she

23  wanted Husband to stay in the room. After some thought, PAPINI asked if she and Husband

24  could talk, so the investigators left the room.

25      e)      When investigators came back into the interview room, they asked PAPINI if

26  she wanted Husband in the room, but she would not answer, so investigators continued with the

27  interview, and said, "The only way to control things is for us to know." PAPINI replied, "I

28  know.  I don't want you to find her ........she's the reason that I get to see my children every

day." Investigators responded, "[We] agree. But we're not going to find her." PAPINI stated, "I don't want to get her in trouble." Investigators then told PAPINI that the DNA evidence found on her clothing at the time of her re-appearance belonged to Ex-Boyfriend, and that PAPINI was not abducted, but had asked Ex-Boyfriend to pick her up. PAPINI responded, "No." When investigators asked if that's not what happened, what did happen, PAPINI answered, "I don't know, no there is no way it's [Ex-Boyfriend]. There's no way. There's no way." Investigators asked PAPINI why she was saying it was not Ex-Boyfriend, and she replied, "Because he loves me. We were friends. There's no way." When investigators directly asked whether Ex-Boyfriend "came and got you because you asked him," PAPINI replied falsely, "No." When asked when was the last time PAPINI had contact with Ex-Boyfriend, PAPINI said falsely that it was before her abduction.  PAPINI was asked when she last saw Ex-Boyfriend, and she replied: "I don't know.  Forever ago when I lived in Southern California." Investigators asked, "You are saying since you have been married you haven't called [Ex-Boyfriend]?" and PAPINI responded falsely, "No I haven't called [Ex-Boyfriend]."

f)       Investigators explained that phone records and DNA evidence showed that PAPINI had been in contact with Ex-Boyfriend and again told PAPINI, "[L]ying to [federal agents] is a crime."  Investigators explained that Ex-Boyfriend provided details no one else would know.  While Husband was still in the interview room, PAPINI continued to deny that she ran away with Ex-Boyfriend. Once Husband left the room, PAPINI admitted that she and Ex-Boyfriend, "did talk a little bit before" and said, "When I went out of town for work.  I talked with other guys......... I made a mistake and I talked to other men and I shouldn't have." When investigators asked PAPINI how she was talking to Ex-Boyfriend, she responded, "My work cell phone." PAPINI continued to say she made a mistake "for talking to other guys" and said, "I am horrible." Ultimately, PAPINI continued to state, "It can't be [Ex-Boyfriend]," and did not provide any further information to investigators about her time with Ex-Boyfriend in Southern California. Investigators asked, "You were pretty clear earlier when I asked what did the younger one do, you said the younger one pointed a gun at you," and PAPINI responded falsely, "She was there [and] she let me go." Investigators stated, "Did a woman point a gun at

you and put you in the car? Yes or no?" and PAPINI responded, "I don't remember." Investigators continued to ask PAPINI what happened with Ex-Boyfriend, and PAPINI stated, "You know who she is, I know you do. I know you know who she is. I am not saying it, I don't want her to get in trouble. I know you know who she is." PAPINI did not at any point throughout the interview disavow her repeated statements that two Hispanic women kidnapped her, nor did she ever admit that Ex-Boyfriend had picked her up and that she had resided at Ex-Boyfriend's home during the period she was reported missing.

**H.    Crowd-Sourced Money Meant to "Bring Her Home" Used to Pay off Credit Cards**

50.     On November 4, 2016, a friend of Husband's created a GoFundMe campaign called "Help Find Sherri Papini" (hereinafter referred to as the "GoFundMe campaign"), with the following stated purpose: "Please help us in raising money to BRING SHERRI HOME SAFE. All funds will go directly to the Papini family and will be used for search efforts to find Sherri and to help bring her home safely.  Every dollar counts as time is critical.  Thanks!"  On the same date, in response to a donor's question as to how the funds would be used, a campaign update was made to the GoFundMe campaign stating, "Thank you to everyone who has donated so far today…the funds will be used in any means necessary for the family to find and bring Sherri home."

51.     On the GoFundMe campaign's page, under the heading of "Organizer and beneficiary," Husband was listed as the "Organizer," and a member of Husband's family was listed as the "Beneficiary."

52.     On November 7, 2016, a campaign update was written on the GoFundMe campaign's page by "[Husband], Organizer" as follows: "Thank you all so much for your donations. I am very happy that the Papini family asked me to help get this GoFundMe account established.  Your generosity, concern and prayers are very much appreciated by the Papini family."

53.     In total, the GoFundMe campaign raised approximately $49,070.

54.     GoFundMe used a third-party service called "WePay" that was administered by JP Morgan Chase Bank. In essence, the GoFundMe campaign beneficiary was able to withdraw funds from the GoFundMe campaign through a bank account set up through WePay with JP Morgan Chase.

1   Husband was a check signer on the JP Morgan Chase bank account used to withdraw the GoFundMe

2   campaign's accounts.

3       55.    On December 6, 2016, after PAPINI was recovered, Husband wrote check number 101

4   in the amount of $31,818.13 from the GoFundMe campaign's bank account at JP Morgan Chase bank

5   to himself. Husband then signed the check, endorsed the check, and deposited it into his personal bank

6   account via a mobile deposit on the same date.

7       56.    On December 6, 2016, Husband wrote check number 103 in the amount of $1,160.06

8   from the GoFundMe campaign's bank account at JP Morgan Chase bank to PAPINI. Husband signed

9   the check as the signatory. PAPINI endorsed the check and deposited the check into her personal bank

10  account via a mobile deposit on the same date.

11      57.    Husband used approximately $8,212 of the GoFundMe campaign funds to make

12  payments towards his personal credit cards.

13      58.    On December 13, 2016, PAPINI spent approximately $3,053 to pay off her personal

14  credit card.

15      59.    The remaining amount of funds that Husband withdrew from the GoFundMe campaign

16  were transferred into Husband and PAPINI's personal bank accounts and were spent on personal

17  expenses.

18  **I.      PAPINI Fraudulently Obtained Thousands in "Victim" Assistance**

19      60.    On November 28, 2016, PAPINI applied to the California Victim Compensation Board

20  ("CalVCB") for assistance. The CalVCB provides financial assistance to victims of violent crimes.  In

21  the application, a series of questions were asked to determine the eligibility of the victim for CalVCB

22  services. The questions and responses in PAPINI's application were as follows:

23          a)     Summary of incident: "Sherri was running in her neighborhood when two

24      suspects produced handguns and ordered her into their vehicle. The suspects then held her

25      captive for 22 days before releasing her."

26          b)     Did the victim reasonably try to avoid or stop the events that resulted in his or

27      her injuries or death?: "She attempted to escape several times."

28

c) Did the victim reasonably cooperate in the investigation and prosecution?: "She has fully cooperated with the investigation." If there was no arrest and/or prosecution, for purposes of determining eligibility, in your professional opinion is it more likely than not that the crime occurred?: "We have not located or identified the suspects."

d) The application further stated, "For the victim of the crime, the following benefits may be available. Please check the crime-related expenses you are requesting." The boxes for "Medical and/or dental expenses," "Moving or relocation expenses," "Mental health treatment," and "Home security improvements" were all checked.

61. PAPINI signed the application on November 28, 2016, under penalty of perjury. Above her signature were the statements, *inter alia*:

a) As required by California law, I will contact and repay the California Victim Compensation Program (CalVCB) if I, or anyone on my behalf receives any payments . . . for losses suffered as a direct result of the crime that was the basis for receipt of benefits from CalVCB . . .

b) Any monies I receive from CalVCB for moving/relocation expense, improving home security . . . will be used only for those purposes.

c) I declare under penalty of perjury under the laws of the State of California that all the information I have provided is true, correct and complete to the best of my knowledge and belief.

d) I understand that I may be found to be ineligible for benefits, and that action may be taken to recover benefits I receive if I provide information that is false, intentionally incomplete, or misleading.

62. In addition to signing the application, the Office of the District Attorney of Shasta County required that PAPINI sign a "Declaration of Understanding of Application and Expenses." PAPINI initialed after each requirement and signed the Declaration on November 28, 2016. The Declaration stated:

> I have been informed by a Crime Victims Assistance Center Advocate that all decisions pertaining to eligibility and payments of expenses are determined by the claims department.

1  Once the application is received by the claims division it may take 30-
   180 days to determine eligibility.
2

3  I understand that each bill is sent to the claims department, and I will be
   notified in writing by the California Victim Compensation Program if the
   bill is recommended for approval or denial. Ultimately you are
4  responsible for all bills that you incur.

5  I understand that by initialing next to #4 I am requesting mileage
   reimbursement for crime related medical, dental and mental health
6  appointments based on the current CalHR allowable rate.

7  I am aware that Shasta County Crime Victims Assistance Advocates will
   under no circumstances give advice on what bills will or will not be paid
8  including relocation determination.

9       63.    On November 28, 2016, a representative with the Shasta County Victim Advocate

10  Program sent the application on behalf of PAPINI to CalVCB. On November 30, 2016, the application

11  was received by CalVCB. On December 7, 2016, CalVCB mailed a letter to PAPINI confirming

12  receipt of the application and enclosing additional information about the program, including the

13  following statement: "The CalVCB can help victims of crime that occur in California and who are

14  injured or threatened with injury."

15      64.    On or about December 9, 2016, CalVCB approved PAPINI's application.  CalVCB

16  internal notes on December 7, 2016, recommended approving the application because the "Law

17  Enforcement Clarification Request Form completed by Det. K. Wallace from the Shasta County

18  Sheriff's Department substantiates that the covered crime 207pc occurred. There are no eligibility

19  issues."

20      65.    CalVCB limited the number of mental health sessions that could be reimbursed per

21  application based on the claimant's filing status. If the claimant reached or was within eight sessions

22  of their mental health session limit, an Additional Treatment Plan was required to be submitted and

23  approved by the CalVCB before sessions exceeding the limit would be considered for reimbursement.

24  PAPINI's therapist submitted multiple Additional Treatment Plans via fax. In these plans, PAPINI's

25  therapist diagnosed her with Acute Posttraumatic Stress Disorder ("PTSD"), and stated specifically

26  that PAPINI had been "kidnapped at gunpoint," "held hostage for 22 days," and "physically and

27  emotionally tortured, beaten, burned, branded, and drugged." The Additional Treatment Plans also

28  stated the following to explain why additional treatment was needed: "Due to the dramatic nature of

the crime and the fact that client has had multiple interviews with law enforcement agencies, the

trauma has been reactivated on multiple occasions;" that one of "[t]he greatest factors affecting this

client's treatment include the fact that her captors have not been located . . ." Based on these

submissions by PAPINI's therapist, the CalVCB approved additional mental health treatments be

covered for PAPINI's fraudulent PTSD on seven separate occasions.

66.    Payment requests for financial assistance were made by the claimants and approved by

the CalVCB. Then checks were issued from the California State Controller's Office ("CSCO") and

mailed to the designated recipient (either to PAPINI or to the entity to be reimbursed, such as a

therapist or emergency services provider).  PAPINI was notified of every reimbursement CalVCB

made as part of the Victim Assistance program via detailed statements mailed to PAPINI's home

address. These letters stated:

> Dear Sherri Louise Papini
>
> We have reviewed the bills or payment requests you submitted. Some or all of the losses you had as a result of the crime are covered by our program. The attached Payment Summary explains what we will be able to pay at this time. . . .
>
> For medical and mental health bills, we pay at set rates........[W]hen any of your providers cash our checks to them, this means they accept our payment on the crime-related portion of your bills as payment in full. . . .

67.    From 2017 through 2021, PAPINI's request for victim assistance funding caused

approximately 35 payments totaling over $30,000 to issue by mail, including to her therapist and the

ambulance provider that transported her after her return on Thanksgiving Day 2016.

| ON OR ABOUT DATE | CalVCB REIMBURSEMENT | AMOUNT |
|---|---|---|
| 1/12/2017 | Payment to PAPINI to purchase blinds for her home. | $  1,000.00 |
| 4/26/2017 | Payment to the ambulance provider who transported PAPINI after her return | $     901.32 |
| 6/5/2017 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $       81.00 |

| 8/7/2017 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 2,997.00 |
|---|---|---|
| 10/9/2017 | Payment to the ambulance provider who transported PAPINI after her return | $ 1,084.53 |
| 12/11/2017 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 411.30 |
| 1/11/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 91.40 |
| 2/8/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 405.00 |
| 2/26/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 70.60 |
| 4/13/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 1,215.00 |
| 6/25/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 486.00 |
| 6/27/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 81.00 |
| 6/29/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 1,944.00 |
| 7/11/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 162.00 |
| 8/20/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 567.00 |
| 9/4/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 1,134.00 |
| 12/7/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 1,640.80 |
| 12/14/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 627.20 |
| 12/19/2018 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 243.00 |

| 1/8/2019 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 972.00 |
|---|---|---|
| 2/19/2019 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 486.00 |
| 3/15/2019 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 567.00 |
| 4/16/2019 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 972.00 |
| 6/3/2019 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 972.00 |
| 6/21/2019 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 972.00 |
| 7/16/2019 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 648.00 |
| 10/7/2019 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 2,430.00 |
| 12/2/2019 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 1,134.00 |
| 1/16/2020 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 972.00 |
| 2/18/2020 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 972.00 |
| 2/20/2020 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 486.00 |
| 4/23/2020 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 648.00 |
| 7/28/2020 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 891.00 |
| 3/2/2021 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 1,458.00 |
| 3/8/2021 | Payment to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | $ 972.00 |
| **TOTAL:** | | $ 30,694.15 |

**J.    Mail Fraud (Count 2 – Section 1341)**

68.    On or about the date listed below, PAPINI did knowingly cause to be deposited, and did knowingly cause to be delivered, a matter and thing to be sent and delivered by the U.S. mail according to the directions thereon, as more specifically set forth below:

| ON OR ABOUT DATE | MAIL MATTER | SENDER |
|---|---|---|
| 8/7/2017 | Payment of $2,997.00 to PAPINI's therapist in treatment for anxiety and PTSD from her purported "kidnapping" | CSCO |

## IV.    CONCLUSION

69.    Based on the foregoing, there is probable cause to believe that PAPINI violated Title 18, United States Code, Section 1001(a)(2) (false statements), and Title 18 United States Code, Section 1341 (mail fraud).

70.    I further request that the Court order that all papers in support of this application, including the affidavit, be sealed until further order of the Court or arrest of the target.  These documents discuss an ongoing criminal investigation that is neither public nor known to the target of

//
//
//
//
//
//
//
//
//
//
//

1 the investigation. Accordingly, there is good cause to seal these documents because their premature

2 disclosure may seriously jeopardize that investigation.

3                                                    Respectfully submitted,

4

5                                                    Courtney E. Lantto
                                                     Special Agent
6                                                    Federal Bureau of Investigation

7

8 Subscribed and sworn to before me on:      3/2/2022

9

10
   Hon. Dennis M. Cota
11 U.S. MAGISTRATE JUDGE

12

13  /s/ *Veronica M.A. Alegria*
   Approved as to form by AUSA Veronica M.A. Alegría
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AFFIDAVIT                                      53

1  the investigation. Accordingly, there is good cause to seal these documents because their premature

2  disclosure may seriously jeopardize that investigation.

3                                                    Respectfully submitted,

4

5                                                    Courtney E. Lantto
                                                     Special Agent
6                                                    Federal Bureau of Investigation

7

8  Subscribed and sworn to before me on:      3/2/2022

9

10  Hon. Dennis M. Cota
11  U.S. MAGISTRATE JUDGE

12

13  /s/ Veronica M.A. Alegria
    Approved as to form by AUSA Veronica M.A. Alegría
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28